RECORD NO. 11-30756

In The

# United States Court of Appeals
### For The Fifth Circuit

## ST. JOSEPH ABBEY; MARK COUDRAIN,

*Plaintiffs – Appellees*,

**v.**

## PAUL WES CASTILLE; BELVA M. PICHON; CRAIG G. GILL; ANDREW HAYES; WALL V. MCKNEELY; MARGARET SHEHEE; KELLY RUSH WILLIAMS; LOUIS CHARBONNET, in their official capacities as Members of the Louisiana State Board of Embalmers and Funeral Directors; PATRICK H. SANDERS, in his official capacity in place of Oscar A. Rollins (deceased),

*Defendants – Appellants.*

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF LOUISIANA AT NEW ORLEANS

---

## BRIEF OF APPELLEES

---

Scott G. Bullock
William H. Mellor
Jeff Rowes
Darpana Sheth
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900
Arlington, Virginia  22203
(703) 682-9320

Frederick E. Schmidt, Sr.
KOCH & SCHMIDT, L.L.C.
650 Poydras Street, Suite 2415
New Orleans, Louisiana  70130
(504) 208-9040

*Counsel for Appellees*

*Counsel for Appellees*

THE LEX GROUP ♦ 1108 East Main Street ♦ Suite 1400 ♦ Richmond, VA  23219
(804) 644-4419 ♦ (800) 856-4419 ♦ Fax: (804) 644-3660 ♦ www.thelexgroup.com

## **CERTIFICATE OF INTERESTED PARTIES**

(1)     Case Number 11-30756:  *St. Joseph Abbey, et al. v. Castille, et al.*

(2)     The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case.  These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

### **Plaintiffs-Appellees:**

(a)     Saint Joseph Abbey
(b)     Deacon Mark Coudrain
         Director of Abbey Christian Life Center and Saint Joseph Woodworks

### **Counsel for Plaintiffs-Appellees:**

(a)     Koch & Schmidt, L.L.C.
         F. Evans Schmidt

(b)     Institute for Justice
         (1) William H. Mellor
         (2) Scott G. Bullock
         (3) Jeff Rowes
         (4) Darpana M. Sheth

**Defendants-Appellants:**

    (a)    Members of the Louisiana State Board of Embalmers and Funeral Directors ("State Board") in their official capacity

        (1)  Paul "Wes" Castille
        (2)  Patrick H. Sanders[1]
        (3)  Belva M. Pichon
        (4)  Craig G. Gill
        (5)  Andrew Hayes
        (6)  Wall V. McKneely
        (7)  Margaret Shehee
        (8)  Kelly Rush Williams
        (9)  Louis Charbonnet

**Counsel for Defendants-Appellants:**

    (a)    Chehardy, Sherman, Ellis, Murray, Recile, Griffith, Stakelum & Hayes, L.L.P.

        (1) George B. Recile
        (2) Michael H. Rasch
        (3) Preston Lee Hayes

    (b)    Walter R. Woodruff, Jr.

    (c)    David W. Grunning

**Amicus Curiae in Support of Defendants-Appellants:**

    (a)    Louisiana Funeral Directors Association

                                 /s/ Scott G. Bullock         
                                 Scott G. Bullock
                                 *Counsel for Plaintiffs-Appellees*

---

[1] On May 16, 2011, Plaintiffs notified all parties and the district court that pursuant to Federal Rule of Civil Procedure 25(d), Patrick H. Sanders was automatically substituted as a named party in his official capacity as a member of the State Board, for his deceased predecessor, Oscar A. Rollins. (USCA5 at 491-92.)

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs-Appellees Saint Joseph Abbey and Deacon Mark Coudrain respectfully request oral argument because this case presents complex constitutional issues. *See* Fed. R. App. P. 34(a); 5th Cir. R. 28.2.3. Additionally, there is a split of authority on the main constitutional question presented by this appeal: whether protecting a discrete industry group from economic competition for that group's financial benefit is a legitimate state interest under rational-basis review. Fed. R. App. P. 34(a)(2)(B).

Defendants-Appellants' *amicus* Louisiana Funeral Directors Association requests ten minutes of any time allotted for oral argument to addresses issues not raised by the district court's findings of fact and conclusions of law or by the State Board's opening brief. The Abbey and Deacon Mark oppose this request on the grounds that any issues not addressed by the district court's opinion, or even by the State Board, are outside the scope of this appeal, and consequently, inappropriate topics for oral argument.

# **TABLE OF CONTENTS**

**Page**

CERTIFICATE OF INTERESTED PARTIES ..........................................................i

STATEMENT REGARDING ORAL ARGUMENT ........................................... iii

TABLE OF CONTENTS............................................................................................iv

TABLE OF AUTHORITIES ................................................................................. vii

STATEMENT OF JURISDICTION.........................................................................1

STATEMENT OF THE ISSUES...............................................................................2

STATEMENT OF THE CASE...................................................................................3

STATEMENT OF THE FACTS ................................................................................5

      A.     Saint Joseph Woodworks:  A "Perfect Work" for Monks ...................5

      B.     The Abbey's "Perfect Work" Is a Crime .............................................7

      C.     Louisiana Law Does Not Require a Casket for Burial, Nor Does
             It Require Funeral Directors to Have Casket-Specific or
             Grief Training......................................................................................8

      D.     Regardless of Where a Consumer Buys a Casket, the Structure
             of Funeral Pricing Requires Her to Pay Thousands of Dollars to
             a Funeral Director for Basic Advice ...................................................9

      E.     FTC Regulation of Funeral Directors' Consumer-Exploitative
             Practices...........................................................................................10

      F.     Funeral Directors Oppose Legislative Reform and the Abbey
             Brings Suit........................................................................................13

SUMMARY OF ARGUMENT ..............................................................................14

ARGUMENT ..................................................................................16

I.    STANDARD OF REVIEW ......................................................16

II.   THE DISTRICT COURT WAS CORRECT THAT PURE ECONOMIC
PROTECTIONISM IS NOT A LEGITIMATE GOVERNMENT INTEREST ........17

    A.    The District Court Correctly Rejected *Powers* Because
the Supreme Court Held in *Metropolitan Life Insurance
v. Ward* that Pure Economic Protectionism Is Not
Legitimate ................................................................................18

    B.    This Court Along with the Ninth Circuit has Rejected
Pure Economic Protectionism as an Acceptable
Governmental Interest Under Rational Basis Review .............22

III.  THE RATIONAL BASIS TEST IS A MEANINGFUL STANDARD OF
REVIEW ....................................................................................24

    A.    Plaintiffs Prevail When They Establish That There Is No
Logical Connection Between the Challenged Law and
Any Legitimate Government Interest ......................................26

        i.    No Logical Connection..................................................28

        ii.   No Legitimate Government Interest...............................29

    B.    Courts Consider Evidence Adduced by Plaintiffs to
Negate Hypothetical Rationales, Particularly in Cases
Where There Is Strong Evidence of an Illegitimate
Government Interest.................................................................30

    C.    *Craigmiles*, *Casket Royale*, and *Peachtree* Properly
Applied Rational-Basis Review and Should Guide the
Court Here................................................................................32

IV.   THE DISTRICT COURT CORRECTLY DETERMINED THAT, AS IN
      CRAIGMILES, CASKET ROYALE, AND PEACHTREE, CONSUMER
      PROTECTION DOES NOT JUSTIFY PROHIBITING THE ABBEY AND
      DEACON MARK FROM SELLING CASKETS ...........................................35

      A.    The District Court Was Correct That the Funeral Rule
            and the Structure of Funeral Pricing Provide the Proper
            Context for the Constitutional Analysis....................................36

      B.    The District Court Was Correct That Funeral Directors
            Are Not "Grief Counselors".......................................................37

      C.    The District Court Correctly Rejected the State Board's
            Alleged Worries About Southern Louisiana Crypts and
            the Varied State of Human Remains..........................................39

      D.    The District Court Was Correct That Internet Casket
            Sales Fatally Undermine Any Consumer-Protection
            Rationale ....................................................................................41

      E.    The State Board Has Correctly Abandoned Any
            Argument That Louisiana Has a Legitimate Health or
            Safety Interest in Who Sells Caskets ........................................43

V.    THE DISTRICT COURT CORRECTLY RULED IN FAVOR OF THE
      ABBEY AND DEACON MARK UNDER CRAIGMILES, CASKET
      ROYALE, AND PEACHTREE, AND AFFIRMING THE DISTRICT COURT
      IS NOT A RETURN TO LOCHNER...........................................................45

CONCLUSION ....................................................................................................47

CERTIFICATE OF FILING AND SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Aladdin's Castle, Inc. v. City of Mesquite*,
  630 F.2d 1029 (5th Cir. 1980) ..................................................... 26

*Allegheny Pittsburgh Coal Co. v. Comm'n of Webster City*,
  488 U.S. 336 (1989) ........................................................ 21, 26, 29

*Anderson v. City of Bessemer City*,
  470 U.S. 564 (1985) .................................................................. 17

*Brown v. Hovatter*,
  561 F.3d 357 (4th Cir. 2009) ................................................. 34, 35

*Casket Royale, Inc. v. Mississippi*,
  124 F. Supp. 2d 434 (S.D. Miss. 2000) ................................ *passim*

*Chappelle v. Greater Baton Rouge Airport Dist.*,
  431 U.S. 159 (1977) ............................................................. 26, 29

*Chastleton Corp. v. Sinclair*,
  264 U.S. 543 (1924) .................................................................. 42

*City of Cleburne v. Cleburne Living Ctr., Inc.*,
  473 U.S. 432 (1985) ........................................................ 26, 29, 31

*Craigmiles v. Giles*,
  110 F. Supp. 2d 658 (E.D. Tenn. 2000) ..................................... 40

*Craigmiles v. Giles*,
  312 F.3d 220 (6th Cir. 2002) ............................................... *passim*

*Creekmore v. Atty. Gen. of Tex.*,
  341 F. Supp. 2d 648 (E.D. Tex. 2004) ....................................... 27

*Dandridge v. Williams*,
    397 U.S. 471 (1970)....................................................................................26

*Doe v. Plyler*,
    458 F. Supp. 569 (E.D. Tex. 1978) .............................................................27

*Doe v. Plyler*,
    628 F.2d 448 (5th Cir. 1980) .......................................................................26

*Esperanza Peace and Justice Ctr. v. San Antonio*,
    316 F. Supp. 2d 433 (W.D. Tex. 2001) .......................................................27

*Ferguson v. Skrupka*,
    372 U.S. 726 (1963).................................................................................21, 22

*Fitzgerald v. Racing Ass'n of Cent. Iowa*,
    539 U.S. 103 (1989).................................................................................20, 21

*Fred C. v. Tex. Health and Human Servs. Comm'n*,
    988 F. Supp. 1032 (W.D. Tex. 1997) ..........................................................27

*Greater Houston Small Taxicab Co. Owners Ass'n v.*
*City of Houston*, ("*Houston Taxi*")
    660 F.3d 235 (5th Cir. 2011) ..............................................................*passim*

*Guardian Plans, Inc. v. Teague*,
    870 F.2d 123 (4th Cir. 1989) ...............................................................34, 35

*Harper v. Lindsay*,
    616 F.2d 849 (5th Cir. 1980) ..................................................... 25, 26-27

*Heller v. Doe*,
    509 U.S. 312 (1993).....................................................................................30

*Hooper v. Bernalillo Cnty. Assessor*,
    472 U.S. 612 (1985).................................................................................26, 30

*Houston Balloons & Promotions, LLC. v. City of Houston*,
    2009 WL 1811224 (S.D. Tex. Jun. 24, 2009) .............................................27

*Hunt v. City of Longview*,
    932 F. Supp. 828 (E.D. Tex. 1995) ..............................................................27

*James v. Strange*,
    407 U.S. 128 (1972)......................................................................................26

*Kelo v. City of New London*,
    545 U.S. 469 (2005)......................................................................................31

*La. Seafood Mgmt. Council Inc. v. Foster*,
    917 F. Supp. 439 (E.D. La. 1996)................................................................27

*Lawrence v. Texas*,
    539 U.S. 558 (2003)................................................................................26, 30

*Leary v. United States*,
    395 U.S. 6 (1969)..........................................................................................42

*Linda R.S. v. Richard D.*,
    335 F. Supp. 804 (N.D. Tex. 1971) ..............................................................27

*Lindsey v. Normet*,
    405 U.S. 56 (1972)........................................................................................26

*Margaret S. v. Edwards*,
    448 F. Supp. 181 (E.D. La. 1980)................................................................27

*Margaret S. v. Treen*,
    597 F. Supp. 636 (E.D. La. 1984)................................................................27

*Mathews v. Lucas*,
    427 U.S. 495 (1976)......................................................................................27

*Mayer v. City of Chicago*,
    404 U.S. 189 (1971)................................................................................26, 29

*McDonald v. Bd. of Miss. Levee Comm'n*,
    646 F. Supp. 449 (N.D. Miss. 1986) ............................................................27

*Meadows v. Odom*,
    360 F. Supp. 2d 811 (M.D. La. 2005) ...........................................................23

*Meadows v. Odom*,
    198 Fed. Appx. 348 (5th Cir. 2006) ............................................................23

*Merrifield v. Lockyer*,
    547 F.3d 978 (9th Cir. 2008) .......................................................17, 23, 24, 46

*Metro. Life Ins. Co. v. Ward*,
    470 U.S. 869 (1985)........................................................................18, 19, 26

*Milnot Co. v. Richardson*,
    350 F. Supp. 221 (S.D. Ill. 1972) .................................................................42

*Nashville, C. & St. L. Ry. v. Walters*,
    294 U.S. 405 (1935)......................................................................................42

*New Orleans v. Dukes*,
    427 U.S. 297 (1976)...............................................................................20, 21

*Newman Marchive P'ship v. Hightower*,
    2010 WL 3306904 (W.D. La. Aug. 18, 2010) .............................................27

*Nordlinger v. Hahn*,
    505 U.S. 1 (1992)...........................................................................................21

*One Beacon Ins. Co. v. Crowley Marine Servs., Inc.*,
    648 F.3d 258 (5th Cir. 2011) ........................................................................16

*Peachtree Caskets Direct, Inc. v. Ga. State Bd. of Funeral Servs.*,
    No. 1:98-cv-3084-MHS, 1999 WL 33651794
    (N.D. Ga. Feb. 9, 1999) ......................................................................*passim*

*Penn. Funeral Directors Ass'n, Inc. v. FTC*,
    41 F.3d 81 (3d Cir. 1994) .............................................................................11

*Plyler v. Doe*,
    457 U.S. 202 (1982)...............................................................................26, 31

*Powers v. Harris*,
    379 F.3d 1208 (10th Cir. 2004) ............................................................*passim*

*Quinn v. Millsap*,
    491 U.S. 95 (1989)...........................................................................26, 29

*Reed v. Reed*,
    404 U.S. 71 (1971)..................................................................................26

*Reliable Consultants, Inc. v. Earle*,
    517 F.3d 738 (5th Cir. 2008) ..................................................................26

*Romer v. Evans*,
    517 U.S. 620 (1996)..............................................................20, 23, 26, 30

*Santos v. City of Houston*,
    852 F. Supp. 601 (S.D. Tex. 1994)..........................................................27

*Simi Inv. Co. Inc v. Harris County*,
    236 F.3d 240 (5th Cir. 2000) ..................................................................26

*Slaughter-House Cases*,
    83 U.S. 36 (1873)...................................................................................46

*Thompson v. Gallagher*,
    489 F.2d 443 (5th Cir. 1973) ..................................................................27

*Turner v. Fouche*,
    396 U.S. 346 (1970)..........................................................................26, 29

*U.S. Dep't of Agric. v. Moreno*,
    413 U.S. 528 (1973)......................................................................26, 29, 30

*United States v. Carolene Prods. Co.*,
    304 U.S. 144 (1938)................................................................................42

*United States v. Lopez*,
    514 U.S. 549 (1995)................................................................................26

*United States v. Morrision*,
    529 U.S. 598 (2000)........................................................................26

*Village of Willowbrook v. Olech*,
    528 U.S. 562 (2000)........................................................................26

*Walters v. Edwards*,
    396 F. Supp. 808 (E.D. La. 1975)..................................................27

*Warner v. St. Bernard Parish Sch. Bd.*,
    99 F. Supp. 2d 748 (E.D. La. 2000) ..............................................27

*Wheeler v. Pleasant Grove*,
    664 F.2d 99 (5th Cir. 1981) ............................................................26

*White v. State Farm Mut. Auto. Ins. Co.*,
    907 F. Supp. 1012 (E.D. Tex. 1995) ..............................................27

*Williams v. Vermont*,
    472 U.S. 14 (1985).....................................................................26, 29

*Williamson v. Lee Optical of Okla., Inc.*,
    348 U.S. 483 (1955)...........................................................19, 20, 21

*Zobel v. Williams*,
    457 U.S. 55 (1982).............................................................26, 28, 30

## CONSTITUTIONAL PROVISION

U.S. Const. amend. XIV ...............................................................1, 2, 46

## STATUTES

28 U.S.C. § 1291 ...............................................................................1

28 U.S.C. § 1331 ...............................................................................1

28 U.S.C. § 1343 ...............................................................................1

28 U.S.C. § 2201 ...............................................................................1

42 U.S.C. § 1983 ..................................................................................... 1

La. Rev. Stat. § 37:831(37) ............................................................... 4, 7

La. Rev. Stat. § 37:831(41) .................................................................. 4

La. Rev. Stat. § 37:832(A)(2) ............................................................. 11

La. Rev. Stat. § 37:832(B)(1) ............................................................. 11

La. Rev. Stat. § 37:842 .................................................................... 8, 9

La. Rev. Stat. § 37:842(A)-(C) ............................................................ 5

La. Rev. Stat. § 37:842(D) .................................................................. 7

La. Rev. Stat. § 37:842(D)(1) ............................................................. 7

La. Rev. Stat. § 37:842(D)(3) ............................................................. 8

La. Rev. Stat. § 37:848(A) .................................................................. 7

La. Rev. Stat. § 37:850 ...................................................................... 7

## **REGULATIONS**

16 C.F.R. §§ 453.1 *et seq.* .............................................................. 10

16 C.F.R. § 453.2(b)(4)(iii)(C) ...................................................... 9, 37

16 C.F.R. § 453.4(b) ........................................................................ 40

16 C.F.R. § 453.4(b)(i) ..................................................................... 10

16 C.F.R. § 453.4(b)(ii) .................................................................... 10

La. Admin. Code tit. 46, part XXXVII, § 503 ..................................... 9

La. Admin. Code tit. 46, part XXXVII, § 903(3)-(5) ............................ 8

# <u>OTHER AUTHORITIES</u>

47 Fed. Reg. 42266 (Sept. 24, 1983) ...................................................................10, 11

59 Fed. Reg. 1592 (Jan. 11, 1994) ............................................................................12

73 Fed. Reg. 13740 (Mar. 14, 2008).........................................................................13

Cass R. Sunstein, *Naked Preferences and the Constitution*,
84 Colum. L. Rev. 1689, 1721 (1984) ......................................................................19

## <u>STATEMENT OF JURISDICTION</u>

Plaintiffs-Appellees filed this civil rights lawsuit for violations of the Fourteenth Amendment to the United States Constitution under the Civil Rights Act of 1871, 42 U.S.C. § 1983, and the Declaratory Judgment Act, 28 U.S.C. § 2201.  The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1343.

This Court has appellate jurisdiction under 28 U.S.C. § 1291 to review the final judgment entered by the district court on July 21, 2011.  (USCA5 at 921-22.) Defendant-Appellant members of the State Board timely filed their notice of appeal on August 15, 2011.  (USCA5 at 929-30.)

## <u>STATEMENT OF THE ISSUES</u>

1.      Did the district court correctly hold that protecting a discrete industry group from economic competition, absent any public purpose, is not a legitimate government interest under rational-basis review?

2.      Did the district court correctly hold that there is no rational basis under the Due Process and Equal Protection Clauses of the Fourteenth Amendment for requiring persons who intend solely to sell caskets to the public to comply with the full panoply of licensing requirements for funeral directors and funeral establishments?

## STATEMENT OF THE CASE

On August 12, 2010, Plaintiffs-Appellees Saint Joseph Abbey ("Abbey") and Mark Coudrain ("Deacon Mark") sued the Defendant-Appellant members of the Louisiana State Board of Embalmers and Funeral Directors ("State Board"), in their official capacity, seeking injunctive and declaratory relief on the constitutionality of Louisiana's restriction on who may sell a casket. (USCA5 at 16-37, Doc. #1.) On December 6, 2010, the State Board moved to dismiss the complaint for failure to state a claim, arguing that the State of Louisiana could legitimately enact a law that served no purpose other than protecting a discrete interest group such as funeral directors from economic competition. (USCA5 at 295-306, Doc. #38.) In a well-reasoned opinion denying the State Board's motion to dismiss, the district court held that economic protectionism devoid of any public purpose is not a legitimate government interest.[1] (USCA5 at 442-456, Doc. #59.) The district court's opinion followed the Sixth Circuit's decision in *Craigmiles v. Giles*, 312 F.3d 220 (6th Cir. 2002) which held that economic protectionism is not a legitimate government interest. The district court rejected the Tenth's Circuit's contrary decision in *Powers v. Harris*, 379 F.3d 1208 (10th Cir. 2004). (USCA5 at 451, 455.)

---

[1]     Because the State Board completely ignores the detailed, fifteen-page opinion by the district court in its Statement of the Case, (*see* Appellants' Br. at 4-5), the State Board incorrectly asserts that at trial the district court "rejected, *out of hand*, the notion that economic protectionism is a legitimate governmental interest." (*Id.* at 11.) (emphasis added).

3

On June 6, 2011, the district court conducted a bench trial during which it heard testimony from six witnesses, including unrebutted expert testimony from Dr. David Harrington.  (USCA5 at 695-826, Doc. #90.)  After considering post-trial memoranda, (USCA5 at 830-899, Docs. #92-95), the district court issued its findings of fact and conclusions of law on July 21, 2011.  (USCA5 at 901-920, Doc. #97.)  The district court held there is no rational basis for Louisiana to require persons who seek to retail caskets to undergo the training and expense necessary to comply with full funeral-director and funeral-establishment licensure.  (USCA5 at 901.)  After considering the State Board's asserted rationales of consumer protection and public health and safety, the district court ruled:

> The license has no bearing on the manufacturing and sale of coffins.  It appears that the sole reason for these laws is the economic protection of the funeral industry which . . . the Court has previously found not to be a valid government interest.

(USCA5 at 901.)  Accordingly, the district court entered final judgment in favor of the Abbey and Deacon Mark, permanently enjoining enforcement of the following provisions, which were declared unconstitutional:

1. La. Rev. Stat. § 37:831(37) is unconstitutional on its face to the extent that it includes the selling of caskets within the definition of "funeral directing";

2. La. Rev. Stat. § 37:831(41) is unconstitutional as applied to the selling of caskets by one who is not a state-licensed funeral director; and

3.   La. Rev. Stat. § 37:842(A)-(C) and the practices of the State Board as applied to the Abbey and Deacon Mark are unconstitutional.

(USCA5 at 921-922.)  The State Board timely filed its notice of appeal on August

15, 2011.  (USCA5 at 929-930.)

## STATEMENT OF THE FACTS

Saint Joseph Abbey is a Catholic monastery of 38 monks in Covington,

Louisiana.  (USCA5 at 905.)  Founded in 1889, the Abbey follows the sixth-

century teachings of St. Benedict, who instructed monks to labor with their own

hands.  (USCA5 at 709:4-12; 710:21-23.)  Deacon Mark is an ordained deacon of

the Catholic Church and an employee of the Abbey.  (USCA5 at 902, 905.)

### A.   Saint Joseph Woodworks:  A "Perfect Work" for Monks.

For over a century, the Abbey has made simple wooden caskets to bury its

monks.  (USCA5 at 905-906.)  In the 1990s, Bishop Stanley Ott of Baton Rouge

and Bishop Warren Boudreaux of Houma were buried in Abbey caskets.  (USCA5

at 711:14-16.)  This inspired others to want Abbey caskets for their loved ones.

(USCA5 at 711:16-18.)  After Hurricane Katrina destroyed the timber that the

monks once sold, the Abbey decided to sell caskets to the public.[2]  (USCA5 at

906.)  At the time, three other monasteries in the country were building and selling

caskets.  (USCA5 at 711:10-12; *see also id*. at 138.)  Abbot Justin Brown thought

---

[2]   The Abbey receives no financial support from the Catholic Church.  (USCA5 at 710:8-11.)

the construction and sale of caskets would be "perfect work" because

Saint Benedict taught monks to "keep death daily before their eyes." (USCA5 at

711:24-712:4.)

The Abbey invested $200,000 in "Saint Joseph Woodworks," a new

business to construct and sell monastic caskets. (USCA5 at 906; *see also id.* at

712:5-12.) Deacon Mark manages Saint Joseph Woodworks, supervising monks

and volunteers. (USCA5 at 906.)

The Abbey makes two styles of casket. The first is the "monastic" casket,

which is just a plain box with a flat lid and metal handles. (USCA5 at 906.)

Because of its slim profile, the monastic style is appropriate for above-ground

crypts that may not accept a casket of standard exterior dimensions.[3] The monastic

casket costs $1,500. (USCA5 at 906; Pls.' Trial Ex. 3 in R. Excerpt.) The second

is the "traditional" casket, which is the same plain box, but with a raised lid and

wooden handles. (USCA5 at 906.) The traditional casket costs $2,000. (USCA5

at 906; Pls.' Trial Ex. 3 in R. Excerpt.) These prices are based on comparable

wooden caskets sold by other monasteries. (USCA5 727:22-728:2.) The Abbey

also makes oversized caskets in these same two styles. (USCA5 at 906; Pls.' Trial

Ex. 3 in R. Excerpt.) The monks consider their work to be reverential. They bless

---

[3]    Although both styles of casket have standard interior dimensions, the exterior width of the monastic casket measures 25 inches as compared to the 34 ½ inch width of the traditional casket. (USCA5 at 906; Pls.' Trial Ex. 3 in R. Excerpt.)

each casket, and embed a medal of Saint Benedict at the foot of the casket.

(USCA5 at 722:4-6.)

**B.    The Abbey's "Perfect Work" Is a Crime.**

It is a crime for the Abbey to sell caskets to the public.  Under Louisiana

law, only state-licensed funeral directors may sell caskets to the public.  (USCA5

at 906 (citing La. Rev. Stat. § 37:831(37) (defining "funeral directing")); *see also*

La. Rev. Stat. § 37:848(A) (requiring license to engage in funeral directing).)  The

penalty for each unlicensed casket sale is up to a $2,500 fine and 180 days in jail.

(USCA5 at 907 (citing La. Rev. Stat. § 37:850).)

Furthermore, under Louisiana law, the Abbey would have to become a

licensed funeral establishment to sell caskets.  (USCA5 at 907; *see also* La. Rev.

Stat. § 37:842(D).)  Licensure would require a viewing parlor for 30 people, a

display room for six caskets, an arrangement room, and appropriate signage.

(USCA5 at 907.)  The Abbey would also have to employ a full-time,

state-licensed funeral director.  (USCA5 at 907 (citing La. Rev. Stat.

§ 37:842(D)(1)).)  Additionally, although the Abbey does not intend to handle

human remains (*see* USCA5 at 906), it must install "embalming facilities for the

sanitation, disinfection, and preparation of a human body" in order to sell

caskets.  (USCA5 at 907 (citing La. Rev. Stat. § 37:842(D)(3)).)

Finally, the district court found that Louisiana is the only state that continues to enforce restrictions on who may sell a casket. (USCA5 at 918.)

### C. Louisiana Law Does Not Require a Casket for Burial, Nor Does It Require Funeral Directors to Have Casket-Specific or Grief Training.

Louisiana enforces criminal prohibitions on who may sell a casket even though Louisiana law does not require a casket, container, or other enclosure for burial. (USCA5 at 909; *Id*. at 504, ¶7d.) Additionally, people may lawfully hand-make their own caskets in Louisiana. (USCA5 at 909; *see also id*. at 504, ¶ 7g.) Furthermore, neither Louisiana statutes nor administrative regulations contain any specific requirements for caskets—not size, not weight, not strength, not building materials, not design, and not price. (USCA5 at 909; *Id*. at 504, ¶ 7e.)

Nor must a person seeking to become a funeral director learn about caskets or about grief counseling for those buying caskets. To become a licensed funeral director, one need only earn a high school diploma or GED, pass one year of college in any subject, and complete a one-year apprenticeship. (USCA5 at 907 (citing La. Rev. Stat. § 37:842 and La. Admin. Code tit. 46, part XXXVII, § 903(3)-(5)).) None of the college courses need pertain to funeral directing, grief counseling, or caskets. (USCA5 at 907.) Nor is there any requirement that the apprentice learn about caskets or grief counseling during his apprenticeship. (USCA5 at 907.) Finally, one must pass an exam administered by the International

Conference of Funeral Service Examining Boards.  (USCA5 at 907 (citing La.

Rev. Stat. § 37:842 and La. Admin. Code tit. 46, part XXXVII, § 503).)  The exam

does not test Louisiana law or burial practices.  (USCA5 at 907.)

> **D.    Regardless of Where a Consumer Buys a Casket, the Structure of Funeral Pricing Requires Her to Pay Thousands of Dollars to a Funeral Director for Basic Advice.**

When a family wants to bury a loved one in Louisiana, they must hire a

funeral director to oversee the process because funeral directors are the only ones

authorized by law to provide funeral services.  The Federal Trade Commission

("FTC") allows the funeral director to charge a <u>non-declinable</u> service fee ranging

from $3,000 to $4,000 on top of a-la-carte pricing for each specific good and

service.[4]  (USCA5 at 909 (citing 16 C.F.R. § 453.2(b)(4)(iii)(C)).)  This non-

declinable service fee includes advice about casket selection, and the funeral

director is contractually bound to assist the consumer if there is a problem.

(USCA5 at 909.)  Thus, whenever a consumer retains a funeral director in

Louisiana, it is always the case that the consumer is paying that funeral director

thousands of dollars to provide advice on every aspect of funeral planning,

including the casket purchase.  This is true even if the consumer decides—as is her

---

[4]    For example, when a loved one dies, a consumer must pay the funeral director for each specific service and item—such as transportation, embalming, dressing, a casket, *etc.*—and, on top of that, the non-declinable service fee.

right under federal law, 16 C.F.R. § 453.4(b)(i) and (ii)—to use a casket from a

third party such as an Internet retailer or an organization like the Abbey.

### E.     FTC Regulation of Funeral Directors' Consumer-Exploitative Practices.

The district court made specific findings of fact about the funeral industry

that provided the context for evaluating the record in this case.  In 1984, the

Federal Trade Commission promulgated regulations, known as the Funeral Rule,

16 C.F.R. § 453.1 *et seq*., to mitigate the consumer-exploitative practices of funeral

directors.  (USCA5 at 908.)  These practices included failing to disclose itemized

price information and "bundling" products and services.  (*Id.*)  Bundling forced

consumers to buy the full panoply of funeral goods and services if they wanted

their loved one cared for at all.  (*Id.*)  The Funeral Rule required funeral directors

to provide consumers with an itemized price list and required funeral directors to

allow consumers to purchase only the goods and services they wanted.  (*Id.* at 908

(citing 27 Fed. Reg. 42266 (Sept. 24, 1983)).)

The Funeral Rule exists because the FTC determined that state-licensed

funeral directors across the country were using their government-created monopoly

on funeral goods and services to exploit consumers.  (USCA5 at 758:15-759:4;

*see also* 47 Fed. Reg. at 42289; *Casket Royale Inc. v. Mississippi*, 124 F. Supp. 2d

434, 440 (S.D. Miss. 2000) ("[T]he FTC has found that there is a necessity in

protecting consumers from the pricing practices of the funeral industry, especially

in regard to casket sales.") (citing *Penn. Funeral Directors Ass'n, Inc. v. FTC*, 41 F.3d 81, 83 (3d Cir. 1994).)  The FTC concluded that systematic consumer exploitation was the result of funeral directors organizing themselves into industry groups (such as the State Board's *amicus*, the Louisiana Funeral Directors Association) that lobbied for pro-industry legislation and made consumer-exploitative practices, such as a refusal to disclose prices, part of their professional "ethics" code.  47 Fed. Reg. at 42266.

The FTC specifically determined that it could not rely on states to correct consumer exploitation through their own regulatory apparatus because the legislative and regulatory agenda is dominated at the state level by funeral directors, who—as with this State Board, *see* La. Rev. Stat. § 37:832(A)(2) & (B)(1)—comprise a majority on state regulatory boards.  47 Fed. Reg. at 42289 (finding the "failure of state funeral licensing boards to enact regulations requiring itemized price disclosure is not surprising, given the fact that most state licensing boards are dominated by funeral directors" and that relying on states to correct the "significant" price exploitation "identified in the record" would not "fully correct the problem" now or in the future).  A principal objective of the Funeral Rule was to "encourage entry into the funeral market of new competitors seeking to attract business by offering lower prices."  *Id.* at 42293.

As Plaintiffs' expert Dr. David Harrington testified at trial,[5] the disclosure of funeral homes' casket prices—which revealed the significant mark-ups, often up to four times the wholesale price—led entrepreneurs to pursue casket retailing, thereby creating a market for third-party casket sales. (USCA5 at 908; *see also* 59 Fed. Reg. 1592, 1593 (Jan. 11, 1994) ("The emergence of third-party casket sellers. . . [has] developed in the market since the Rule's promulgation.".) Entrepreneurs realized that they could compete with funeral homes by charging reasonable prices for caskets, and thus retail casket selling was born.

To counter this growing market for third-party caskets, funeral directors, who are the only ones authorized to oversee the interment of remains, refused to accept third-party caskets and perform the funeral unless the consumer paid exorbitant "casket handling" fees. (USCA5 at 908 (citing 59 Fed. Reg. at 1604-05).) In 1994, the FTC responded by amending the Funeral Rule to ban casket-handling fees and protect the ability of consumers to purchase caskets from third-party casket vendors. (USCA5 at 908; *see also* 59 Fed. Reg. at 1604 ("[C]asket handling fees are unfair conditions on a consumer's right to decline unwanted items he or she may wish to purchase elsewhere. . . . ").)

In 2008, the FTC not only retained the Funeral Rule after a multi-year study, but it also expressly refused to subject third-party casket vendors to the rule

---

[5] The district court qualified Dr. Harrington as an expert on the economics of funeral markets and the national market for third-party casket sales. (USCA5 at 908; *see also id*. at 751:14-16.)

because, in contrast to the documented conduct of state-licensed funeral directors, there was no evidence that third-party casket vendors systematically exploited consumers.  (USCA5 at 774; *see also* 73 Fed. Reg. 13740, 13745 (Mar. 14, 2008) ("The record is bereft of evidence indicating significant consumer injury caused by third-party sellers.").)

With the advent of the internet, consumers can now buy caskets from retailers across the country, including big-box stores such as Wal-Mart and Costco, and online retailers such as Amazon.com.  (USCA5 at 908.)  Consequently, Louisiana consumers can purchase caskets from these out-of-state retailers who are not subject to Louisiana's funeral statutes.  (*Id*.)  As the district court emphasized, although Louisiana consumers are able to buy caskets from any out-of-state retailer even though the retailer is unlicensed in Louisiana, consumers do not enjoy this right with respect to in-state retailers such as the Abbey.  (*Id*. at 909.)

### F.    Funeral Directors Oppose Legislative Reform and the Abbey Brings Suit.

On December 11, 2007, the State Board ordered the Abbey not to sell caskets to the public.  (USCA5 at 506, ¶ 7r.)  On January 8, 2008, Boyd Mothe, Sr., a state-licensed funeral director, owner of several funeral homes, and chair of the Legislative Committee for the State Board's *amicus*, the Louisiana Funeral Directors Association, initiated a formal complaint against the Abbey.  (USCA5 at 506, ¶ 7s.)

The Abbey petitioned the legislature in 2008 to reform the law to allow non-profit charitable groups such as the Abbey to sell caskets.  (USCA5 at 713:15-18.)  Licensed funeral directors mounted organized opposition.  (USCA5 at 713:22-714:24; *see also*  Br. of *Amicus Curiae* La. Funeral Directors Ass'n ("LFDA *Amicus* Br.") at 3.)  No member of the public opposed the sale of caskets by the Abbey.  (USCA5 at 714:25 - 715:3, 715:8-11.)  The proposal was not successful.  (USCA5 at 715:13-15.)  The Abbey attempted legislative reform again in 2010, but that effort died in committee.  (USCA5 at 715:16-20.)  Plaintiffs' expert Dr. David Harrington, the nation's leading funeral-industry economist, presented uncontroverted testimony that the various restrictions on casket sales that once existed across the country—and appear to remain in force only in Louisiana—were the result of licensed funeral directors persuading legislators to restrict casket sales to only licensed funeral directors in order to suppress competition and drive up prices.  (USCA5 at 773:8 - 774:4.)

## SUMMARY OF ARGUMENT

Saint Joseph Abbey and Deacon Mark seek only to sell to the public the simple wooden caskets that the monks have been handcrafting for themselves for a century.  But that harmless act is a crime in Louisiana.  Examining the evidence presented at trial, the district court recognized why—pure economic protectionism.

The fundamental constitutional question in this case is whether that makes any difference: is economic protectionism, standing alone, a legitimate state interest?

The State Board and its *amicus*, the Louisiana Funeral Directors Association, say yes. They urge this Court to follow the two-judge majority in *Powers v. Harris*, the sole decision holding that naked economic protectionism is a legitimate government interest. Based on that holding, they further ask this Court to conclude that there is a rational basis for subjecting those who wish only to sell a wooden box to full funeral-director and funeral-establishment licensure.

Unfortunately for the State Board and its friends in the funeral-director cartel, the weight of authority is firmly against them. The United States Supreme Court, the Sixth and Ninth Circuits, and even this Court in October 2011 have rejected the proposition that pure economic protectionism is a legitimate government interest. Our Constitution is designed to protect life, liberty, and property, not confer on government the arbitrary power to abridge our freedoms without any legitimate public justification.

The State Board's appeal depends on this Court being nothing but a rubber-stamp for the government. The State Board's brief is an extended plea for judicial abdication and culminates in a melodramatic invocation of *Lochner*, a long-dead bogeyman that the State Board hopes will scare this Court into reversing the district court.

But rational-basis review, while deferential, is not meaningless, particularly in the casket context.  In four of the five challenges to virtually identical state restrictions on who may sell a casket, courts have invalidated those restrictions as irrational, collectively rejecting a dozen hypothetical justifications, including economic protectionism, just as the district court did below.  More generally, since the 1970s, plaintiffs have prevailed in over 65 rational-basis cases before the U.S. Supreme Court and federal courts within the Fifth Circuit.  In neither the casket cases nor in this wider body of rational-basis jurisprudence was the court improperly sitting as a super-legislature or judging the wisdom, fairness, or effectiveness of the challenged laws.  Rather, the statutes in those cases were invalidated because they were arbitrary.  It is that *arbitrariness*, not a mere policy disagreement with the legislature, that the Abbey and Deacon Mark established in the trial court below.  It is not a return to *Lochner* to invalidate arbitrary and irrational laws that violate the Constitution.

## **ARGUMENT**

### I.    STANDARD OF REVIEW.

In an appeal from a bench trial, "findings of fact are reviewed for clear error and legal issues are reviewed *de novo.*"  *One Beacon Ins. Co. v. Crowley Marine Servs., Inc.*, 648 F.3d 258, 262 (5th Cir. 2011).  A factual finding is only "clearly erroneous" when "although there is evidence to support it, the reviewing court on

the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985) (quotations omitted).

## II.    THE DISTRICT COURT WAS CORRECT THAT PURE ECONOMIC PROTECTIONISM IS NOT A LEGITIMATE GOVERNMENT INTEREST.

The constitutional question at the heart of this appeal is whether pure economic protectionism—protecting private economic interests from competition without any valid public purpose—is a legitimate government interest under rational-basis review.  The Sixth and Ninth Circuits have already ruled that it is not,[6] and in October 2011, this Court indicated that it too believed that pure economic protectionism is not a legitimate government interest.[7]  In contrast, the State Board urges this Court to adopt the Tenth Circuit's two-judge majority in *Powers*.

If this Court decides to do a turnabout and adopt the Tenth Circuit's holding in *Powers*, then the Abbey concedes that it must lose.  After all, if economic protectionism is a legitimate government interest, then the challenged statute is undeniably rational because all it does is funnel casket revenue to licensed funeral directors at the expense of the Abbey, other entrepreneurs, and consumers.

---

[6]    *See Merrifield v. Lockyer*, 547 F.3d 978 (9th Cir. 2008); *Craigmiles v. Giles*, 312 F.3d 220 (6th Cir. 2002).

[7]    *See Greater Houston Small Taxicab Co. Owners Ass'n v. City of Houston*, 660 F.3d 235, 240 (5th Cir. 2011).

But this Court should not follow the Tenth Circuit. As set forth below, the U.S. Supreme Court, the Sixth and Ninth Circuits, and this Court recently, have made clear that the purpose of government power is to advance *public*, not purely *private*, interests. Constitutional limitations on government power are meaningless if public power can be used simply for private gain.

### A.    The District Court Correctly Rejected *Powers* Because the Supreme Court Held in *Metropolitan Life Insurance v. Ward* That Pure Economic Protectionism Is Not Legitimate.

The State Board argues that the evidence of pure economic protectionism is not evidence of a constitutional violation because pure economic protectionism is a legitimate government interest. (Appellants' Br. at 24-29.) In the State Board's view, at worst, the record simply proves that funeral directors are much more savvy than monks and consumers at playing what *Powers* accurately described as "the favored pastime of state and local governments," "dishing out special economic benefits to certain in-state industries." *Powers*, 379 F.3d at 1221.

But neither the State Board nor the two-judge majority in *Powers* seem to understand, as the U.S. Supreme Court held more than 25 years ago, that the Equal Protection Clause does not allow government to favor the private economic interest of "A" over "B" without some independent public justification. *See Metro. Life Ins., Co. v. Ward*, 470 U.S. 869 (1985). *Ward* invalidated a law designed to protect local insurance companies from out-of-state competition. *Id*. at 883. Rather than

resort to the more complex dormant-commerce framework, the Supreme Court rejected the challenged statute on equal-protection grounds because it was simply naked economic favoritism with no rational connection to any valid public purpose. *Id.* at 878. The Supreme Court held that this sort of pure economic protectionism was not a legitimate interest and thus the challenged statute failed rational-basis review. *Id.* at 882 ("In whatever light the State's position is cast, acceptance of its contention that promotion of domestic industry is always a legitimate state purpose under equal protection analysis would eviscerate the Equal Protection Clause in this context.")

The Supreme Court, although deferential to government in the rational-basis context, has never even contemplated upholding a law where the purported government interest is just naked favoritism of "A" over "B." Indeed, the very formulation of the rational basis test—a rational relationship with a *legitimate* government interest—precludes a government interest that is nothing more than private favoritism. To be "equally protected" by the laws necessarily means that the government will not arbitrarily extend special favors to one group to the detriment of another. *See*, *e.g.*, Cass R. Sunstein, *Naked Preferences and the Constitution*, 84 Colum. L. Rev. 1689, 1721 (1984).

The State Board argues that the Supreme Court's decision in *Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483 (1955), supports its position that economic

protectionism is a legitimate governmental interest. (Appellants' Br. at 28.)

Contrary to the State Board's reading, however, *Williamson* and similar cases such

as *New Orleans v. Dukes*, 427 U.S. 297 (1976), held that the challenged statutes in

those cases were constitutional because there was *some* discernible connection to a

legitimate public health or safety justification. Indeed, in explaining the rational-

basis test in *Romer v. Evans*, and, in particular, why the government loses when it

lacks a legitimate government interest, the Supreme Court stressed that

*Williamson*, *Dukes* and similar cases stand for the proposition that statutes must

have a "rational relationship to an *independent* and *legitimate* legislative end[,]"

and that arbitrary favoritism is not enough.[8] *Romer v. Evans*, 517 U.S. 620, 632-

633 (1996). (emphasis added).

The State Board mistakenly claims that the Supreme Court approved pure

economic protectionism in *Fitzgerald v. Racing Association of Central Iowa*, 539

U.S. 103 (1989). (Appellants' Br. at 11.) The State Board's assertion is

demonstrably false for four reasons. First, unlike here, the government in

*Fitzgerald* did not ban everyone but a select group of insiders from plying a

---

[8]     The district court below properly rejected the notion put forward by the two-judge majority in *Powers* and repeated by the State Board here that *Williamson Lee Optical* "so closely mirrors the facts" of this case that "merely a citation" to the Supreme Court case should have "sufficed to dispose of the case." *See* Appellants' Br. at 28 (citing *Powers*, 379 F.3d at 1221). As the district court noted: "At the heart of that decision [*Williamson Lee Optical*] was the regulation of the health—the eyesight—of an individual who would purchase glasses. . . . Thus, *Williams*[*on*], the purported lynchpin for the *Powers* decision, does not conclude that economic protection for optometrists or ophthalmologists to the detriment of opticians serves a rational basis; the decision is based on the Court's perception of the law's advancement of a public good." (USCA5 at 454-455.)

trade.  Instead, the government simply used taxes to subsidize riverboat casinos while allowing other casinos to fully operate.  *Id*. at 107-108.  Second, the Court recognized, just as it did in *Dukes* and *Williamson*, that the government in *Fitzgerald* was not "simply aiding the financial position of the riverboats," but also promoting legitimate governmental interests such as "encourag[ing] the economic development of river communities" and "promot[ing] riverboat history."  *Id*. at 109.  Third, the use of differential tax rates to subsidize socially desirable conduct is constitutional only where the differential tax rate has an independent public justification.  *Id.* at 109-10 (*comparing Allegheny Pittsburgh Coal Co. v. Comm'n of Webster City*, 488 U.S. 336 (1989) *to Nordlinger v. Hahn*, 505 U.S. 1 (1992)).  Like the economic protectionism here, a differential tax rate with no valid public justification is unconstitutional.  *See Allegheny Pittsburgh*, 488 U.S. at 346.  Finally, the Court noted in *Fitzgerald* that rational-basis review "is especially deferential in the context of classifications made by complex tax laws."  *Fitzgerald*, 539 U.S. at 107 (quoting *Nordlinger*, 505 U.S. at 11).  Accordingly, the rational-basis standards concerning occupational licensing set forth in *Williamson*, *Dukes*, and similar cases are more directly on point.[9]

---

[9]     The State Board makes a similar misstep in relying on *Ferguson v. Skrupka*, 372 U.S. 726, 732-33 (1963).  (Appellants' Br. at 11.)  While it is true that the Supreme Court afforded states broad latitude in defining debt adjustment as the practice of law, debt adjustment involved complex and long-term financial entanglements that are absent in the sale of a wooden box. More to the point, there was evidence that debt adjusters posed an actual threat to the public welfare and had committed "grave abuses" against low-income customers.  *Ferguson*, 372 U.S.

What makes *Powers* such an outlier is that the Tenth Circuit essentially ruled that a law need not have any connection whatsoever to public health, safety, or welfare for it to be upheld.  Even the concurring judge in *Powers* rejected this sweeping, unprecedented holding:

> The majority is correct that courts have upheld regulatory schemes that favor some economic interests over others. Many state classifications subsidize or promote particular industries or discrete economic actors. . . .  But all of the cases rest on a fundamental foundation:  the discriminatory legislation arguably advances either the general welfare or a public interest.

*Powers*, 379 F.3d at 1225 (Tymkovich, J. concurring).

**B.    This Court Along with the Ninth Circuit has Rejected Pure Economic Protectionism as an Acceptable Governmental Interest Under Rational Basis Review.**

Not only has this Court never adopted *Powers*, it has approved of *Craigmiles*' invalidation of the same casket-selling restrictions that are issue here. *Greater Houston Small Taxicab Co. Owners Ass'n v. City of Houston*, ("*Houston Taxi*") 660 F.3d 235, 240 (5th Cir. 2011) (holding that Houston's method of distributing new taxi cab permits was rationally related to a legitimate government interest).  Writing for the majority, Judge Jones stated:  "In *Craigmiles*, there was

at 727-728 & n. 2.  Here, on the other hand, the district court properly found that evidence, in the form of the FTC Funeral Rule and the FTC's findings, established that any systematic abuses in the context of casket sales are committed by funeral directors.  (USCA5 at 908.)  There is no evidence in the record that third-party casket sales, which are common across the country, present any risk to consumers, and, given the FTC's regulations and findings, the Louisiana legislature could not rationally hypothesize to the contrary.

no logical reason to require casket sellers to obtain funeral director licenses because the types of services at issue were fundamentally different." *Id.*  Although *Houston Taxi* upheld the challenged taxi ordinances, this Court made the point that pure economic protectionism, standing alone, would not have been sufficient to justify those laws:  "*Craigmiles* and other cases confirm that naked economic preferences are impermissible to the extent that they harm consumers."[10]  *Id.* Incredibly, the State Board ignores *Houston Taxi*'s discussion of the central issue raised in *Powers*:  whether economic protectionism is a legitimate governmental interest.

The State Board also ignores that the Ninth Circuit has likewise flatly rejected *Powers* and endorsed *Craigmiles*.  *See Merrifield v. Lockyer*, 547 F.3d 978, 992 n.15 (9th Cir. 2008) ("[W]e agree with the Sixth Circuit in *Craigmiles* and reject the Tenth Circuit's reasoning in *Powers v. Harris*.") (citation omitted). Echoing the Supreme Court in *Romer*, the Ninth Circuit in *Merrifield* emphasized that protectionism might be allowed if alloyed with a legitimate state interest: "there might be instances when economic protectionism might be related to a legitimate governmental interest and survive rational basis review.  However,

---

[10]    While neglecting to mention the most recent decision from this Court, the State Board instead gives much weight to a district court decision that addressed whether Louisiana flower arrangers had to be licensed.  (Appellants' Br. at 29 (citing *Meadows v. Odom*, 360 F. Supp. 2d 811 (M.D. La. 2005).)  In *Meadows*, the district court rejected *Craigmiles* and adopted *Powers* as the proper framework for examining the floristry statutes challenged there.  *Id.* at 822. *Meadows*, which this Court vacated on appeal, *see Meadows v. Odom*, 198 Fed. Appx. 348 (5th Cir. 2006), is in conflict with *Houston Taxi* in this regard and thus is of no persuasive value.

economic protectionism for its own sake, regardless of its relation to the common good, cannot be said to be in furtherance of a legitimate governmental interest." *Id*. Because part of the occupational licensing regime at issue in *Merrifield* was solely advancing the illegitimate interest of economic protectionism, the Ninth Circuit held that it violated the Constitution.

This Court should follow the Supreme Court and the Sixth and Ninth Circuits, and formalize the language in *Houston Taxi*, by squarely holding that pure economic protectionism is not a legitimate government interest.

## III. THE RATIONAL BASIS TEST IS A MEANINGFUL STANDARD OF REVIEW.

As the district court recognized, pure economic protectionism is the only plausible explanation for the challenged statutes in this case and such protectionism is not a legitimate government interest. The salient question at this juncture is whether there is any alternative rational basis that would justify jailing the monks for selling their handmade caskets. The State Board and its *amicus* argue that there is a satisfactory rationale. But this is so only because they regard the rational-basis test as no test at all, and believe there is nothing for this Court to do but rubber-stamp whatever hypothetical rationales the State Board invokes, no matter how implausible, to obscure the evidence of illegitimate economic protectionism that permeates the record.

But the government does not always win, *especially* in the casket context. Including the district court's decision in this case, plaintiffs have prevailed in four of the five challenges to the constitutionality of restrictions on who may sell a casket. Those cases, along with the dozens of decisions from the Supreme Court and from state and federal courts within the Fifth Circuit in which plaintiffs have prevailed, establish the proper methodology for applying rational-basis review. Plaintiffs prevail when they adduce reasoning and evidence establishing no logical connection between the challenged statutory scheme and any plausible legitimate rationale. Indeed, this Court recently acknowledged that the plaintiffs prevailed in *Craigmiles*—a case materially identical to this one—because "there was no logical reason to require casket sellers to obtain funeral director licenses." *Houston Taxi.*, 660 F.3d at 240. Once the plaintiff has eliminated every plausible legitimate rationale, and the only plausible reason for the law is illegitimate, courts do not hesitate to strike down the offending law.[11]

---

[11] The Abbey and Deacon Mark note that there is no need to distinguish between their substantive-due-process and equal-protection claims. Under the rational-basis test, they must establish that there is no rational basis for the challenged statutes. As a practical matter, it is immaterial to that determination whether the argument is framed as a substantive-due-process right to earn an honest living or an equal-protection violation based on Louisiana irrationally treating two different occupations—funeral directors and casket retailers—the same. *See Harper v. Lindsay*, 616 F.2d 849, 854 n. 9 (5th Cir. 1980); *see also Craigmiles*, 312 F.3d at 224-29 (applying rational-basis test without separately analyzing the equal-protection and due-process claims).

A.     **Plaintiffs Prevail When They Establish That There Is No Logical Connection Between the Challenged Law and Any Legitimate Government Interest.**

The State Board portrays rational-basis review as essentially a charade in which the outcome is foreordained.  The State Board devotes seven pages, (*see* Appellants' Br. at 16-22), to quoting familiar rational-basis boilerplate such as "it does not offend the Constitution simply because the classification is not made with mathematical nicety."  *Id*. at 18 (quoting *Dandridge v. Williams*, 397 U.S. 471, 485 (1970)).[12]  The purpose of this recitation is to persuade this Court that "rational-basis review" is code for "the government always wins."

Seven-pages of boilerplate, however, do not explain how or why, since the 1970s, the Supreme Court,[13] and federal courts within the Fifth Circuit,[14] as well as

---

[12]    The *amicus* brief of the Louisiana Funeral Directors Association takes a similar approach. (LFDA *Amicus* Br. at 10-12.)

[13]    *See Lawrence v. Texas*, 539 U.S. 558, 578 (2003); *United States v. Morrision*, 529 U.S. 598, 614-15 (2000); *Village of Willowbrook v. Olech*, 528 U.S. 562, 565 (2000); *Romer v. Evans*, 517 U.S. 620, 634-35 (1996); *United States v. Lopez*, 514 U.S. 549, 567 (1995); *Quinn v. Millsap*, 491 U.S. 95, 108 (1989); *Allegheny Pittsburgh Coal Co. v. County Comm'n*, 488 U.S. 336, 345 (1989); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 447 (1985); *Hooper v. Bernalillo Cnty. Assessor*, 472 U.S. 612, 623 (1985); *Williams v. Vermont*, 472 U.S. 14, 24-25 (1985); *Metro. Life Ins. Co. v. Ward*, 470 U.S. 869, 880 (1985); *Plyler v. Doe*, 457 U.S. 202, 230 (1982); *Zobel v. Williams*, 457 U.S. 55, 64 (1982); *Chappelle v. Greater Baton Rouge Airport Dist.*, 431 U.S. 159 (1977); *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973); *James v. Strange*, 407 U.S. 128, 141-42 (1972); *Lindsey v. Normet*, 405 U.S. 56, 77-78 (1972); *Mayer v. City of Chicago*, 404 U.S. 189, 196 (1971); *Reed v. Reed*, 404 U.S. 71, 76-77 (1971); *Turner v. Fouche*, 396 U.S. 346, 363-64 (1970).

[14]    *See Reliable Consultants, Inc. v. Earle*, 517 F.3d 738, 746 (5th Cir. 2008); *Simi Inv. Co. Inc v. Harris County*, 236 F.3d 240, 251 (5th Cir. 2000); *Wheeler v. Pleasant Grove*, 664 F.2d 99, 100 (5th Cir. 1981); *Aladdin's Castle, Inc. v. City of Mesquite*, 630 F.2d 1029, 1030-41 (5th Cir. 1980); *Doe v. Plyler*, 628 F.2d 448, 459 (5th Cir. 1980); *Harper v. Lindsay*, 616 F.2d 849, 855

the district court below, sometimes conclude that plaintiffs win under rational-basis review. Reading the rational-basis case law as a whole—and not relying on cherry-picked language from cases where the plaintiff loses—reveals an underlying logic to rational-basis review that is absent in the State Board's account. *Cf. Mathews v. Lucas*, 427 U.S. 495, 510 (1976) (stating that, although deferential, rational-basis review is not "toothless[.]" (citing cases where plaintiffs win rational-basis challenges). Understanding this logic will enable this Court to see why the district court properly concluded that this is one of those limited cases in which the plaintiffs have carried their burden under rational-basis review.

Courts invalidate statutes under rational-basis review in two circumstances: (1) when there is no logical connection between the challenged law and any legitimate government interest; and (2) when the proffered justifications for a law are a pretext and the government is attempting to advance an illegitimate interest.

---

(5th Cir. 1980); *Thompson v. Gallagher*, 489 F.2d 443, 449 (5th Cir. 1973); *Newman Marchive P'ship v. Hightower*, 2010 WL 3306904 (W.D. La. Aug. 18, 2010); *Houston Balloons & Promotions, LLC. v. City of Houston*, 2009 WL 1811224 at *6 (S.D. Tex. Jun. 24, 2009); *Creekmore v. Attorney Gen. of Tex.*, 341 F. Supp. 2d 648, 668 (E.D. Tex. 2004); *Esperanza Peace and Justice Ctr. v. San Antonio*, 316 F. Supp. 2d 433, 467-69 (W.D. Tex. 2001); *Casket Royale v. Miss.*, 124 F. Supp. 2d 434, 440 (S.D. Miss. 2000); *Warner v. St. Bernard Parish Sch. Bd.*, 99 F. Supp. 2d 748, 752 (E.D. La. 2000); *Fred C. v. Tex. Health and Human Servs. Comm'n*, 988 F. Supp. 1032 (W.D. Tex. 1997); *La. Seafood Mgmt. Council Inc. v. Foster*, 917 F. Supp. 439, 442 (E.D. La. 1996); *White v. State Farm Mut. Auto. Ins. Co.*, 907 F. Supp. 1012, 1018-19 (E.D. Tex. 1995); *Hunt v. City of Longview*, 932 F. Supp. 828, 840 (E.D. Tex. 1995); *Santos v. City of Houston*, 852 F. Supp. 601, 607-09 (S.D. Tex. 1994); *McDonald v. Bd. of Miss. Levee Comm'n*, 646 F. Supp. 449, 471-73 (N.D. Miss. 1986); *Margaret S. v. Treen*, 597 F. Supp. 636 (E.D. La. 1984*); Margaret S. v. Edwards*, 448 F. Supp. 181, 211 (E.D. La. 1980); *Doe v. Plyler*, 458 F. Supp. 569, 585-86 (E.D. Tex. 1978); *Walters v. Edwards*, 396 F. Supp. 808, 819-20 (E.D. La. 1975); *Linda R.S. v. Richard D.*, 335 F. Supp. 804, 812 (N.D. Tex. 1971).

> *i.*     *No Logical Connection.*

A statute fails rational-basis review when it lacks a logical connection with any proffered rationale.  In *Zobel v. Williams*, for example, new residents of Alaska challenged a state program that gave oil money only to Alaskans who had been residents prior to 1980.  457 U.S. 55, 56-57 (1982).  Alaska asserted two reasons for bestowing a cash windfall on pre-1980 residents:  (1) encouraging settlement in sparsely populated Alaska; and (2) giving residents a stake in the prudent management of oil reserves. [15] *Id.* at 61.

The Supreme Court held that neither reason provided any logical support for the law.  *Id.* at 62.  First, if the goal were to encourage people to move to Alaska, it was patently illogical to pay oil money to *existing* residents while denying oil money to *new* residents.  *See id.*  Second, if the goal were to preserve resources by *including* residents in oil revenue, it was illogical to *exclude* many Alaskans from oil revenue based on an arbitrary date.  *See id.* at 62-63.  Thus, when a rational-basis challenge goes beyond a mere policy disagreement and identifies fundamental irrationalities in a proffered justification for a law, courts simply do

---

[15]  The State also asserted that the distinction served "to reward citizens for past contributions" to the State, which the Supreme Court had previously held was not in itself a legitimate state interest.  *Id.* at 63.

not credit those rationales.  Where every asserted rationale is logically refuted,

courts should, and do, strike down the challenged law.[16]

### ii.    No Legitimate Government Interest.

Courts also invalidate challenged statutes under rational-basis review when

the law is plausibly advancing only illegitimate government interests such as

economic protectionism or irrational animus towards a disfavored group.  For

example, in *City of Cleburne v. Cleburne Living Center, Inc.*, the city of Cleburne

denied a building permit for a group home for the mentally handicapped even

though it granted building permits to other similar residential uses that did not

involve the mentally handicapped.  473 U.S. 432, 437 (1985).  The Supreme Court

rejected five hypothetical rationales for the permit denial—such as a purported

concern about liability for the misbehavior of the mentally handicapped—because

none of them had any ring of plausibility.  *Id.* at 449.  After rejecting every

proffered rationale as implausible, the Supreme Court was left with the obvious:

---

[16]    *See also Quinn v. Millsap*, 491 U.S. 95, 108 (1989) (ability to grasp politics not logically
connected to land ownership); *Allegheny Pittsburgh Coal Co. v. County Comm'n*, 488 U.S. 336,
345 (1989) (disparities in tax rates so enormous as to be illogical); *City of Cleburne v. Cleburne
Living Ctr.*, 473 U.S. 432, 449-50 (1985) (home being too big not logical basis for permit denial
when identical homes routinely granted permits); *Williams v. Vermont*, 472 U.S. 14, 24-25
(1985) (encouraging Vermont residents to make in-state car purchases not logical basis for tax on
car that Vermont resident purchased out-of-state before becoming Vermont resident); *Chappelle
v. Greater Baton Rouge Airport Dist.*, 431 U.S. 159 (1977) (ability to grasp politics not logically
connected to land ownership); *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973)
(stimulating the agricultural economy not logically connected to whether people in a household
are related or unrelated); *Mayer v. City of Chicago*, 404 U.S. 189, 196 (1971) (if inability to pay
is no basis to deny transcript to felony defendant, then inability to pay no logical basis for
denying transcript to misdemeanent); *Turner v. Fouche*, 396 U.S. 346, 363-64 (1970) (no
rational interest underlying property-ownership requirement for political office).

the City of Cleburne was simply trying to exile the mentally handicapped.

Because it held that irrational animus toward the mentally handicapped does not

provide any legitimate basis for government policy, the Supreme Court invalidated

the building-permit denial.  Thus, when a law serves no legitimate government

interest, courts should, and do, strike those laws down.[17]

> **B.      Courts Consider Evidence Adduced by Plaintiffs to Negate Hypothetical Rationales, Particularly in Cases Where There Is Strong Evidence of an Illegitimate Government Interest.**

Although the government has no affirmative evidentiary burden and may

invoke purely hypothetical reasons for a challenged law, *e.g.*, *Heller v. Doe*, 509

U.S. 312, 319-20 (1993), that does not mean that evidence is irrelevant in the

rational-basis context.  Plaintiffs may carry their burden of "negativing" every

plausible basis for a law by adducing evidence that the law is irrational.  It is

commonplace for courts conducting a rational-basis analysis to refer to record

evidence in concluding that a purported justification for a law is too implausible to

credit.  For example, in *Cleburne*, the government posited that junior-high students

from across the street might tease the mentally handicapped, but the Supreme

Court rejected the plausibility of this based on the evidence that the junior high

---

[17]     *See Lawrence v. Texas*, 539 U.S. 558, 578 (2003) (no legitimate interest in criminalizing consensual adult homosexual acts); *Romer v. Evans*, 517 U.S. 620, 634-35 (1996) (no legitimate interest in anti-gay animus); *Hooper v. Bernalillo Cnty. Assessor*, 472 U.S. 612, 623 (1985) (no legitimate interest in dividing bona fide state residents into different classes); *Zobel v. Williams*, 457 U.S. 55, 64 (1982) (no legitimate interest in creating permanent classes of bona fide residents); *Moreno*, 413 U.S. at 534 (no legitimate interest in anti-hippie animus); *id.* at 535 & n.7 ("traditional morality" rationale constitutionally dubious).

school had thirty mentally handicapped students. *Cleburne*, 473 U.S. at 449; *see also*, *e.g.*, *Plyler v. Doe*, 457 U.S. 202, 230 (1982) (record evidence cited to refute the government's assertion that perhaps illegal-alien children are less likely to remain in state); *Craigmiles*, 312 F.3d at 225 (public-health justification for restricting who can sell a casket refuted by evidence that retailers do not handle remains). Thus, while the State Board need not rely on evidence to prevail, the Abbot and Deacon Mark may use evidence to prove that the State Board's hypothetical rationales are irrational.

As a practical matter, the use of evidence and reasoning to refute asserted rationales is particularly prevalent in cases in which the most plausible explanation for a law is an illegitimate government interest such as pure economic protectionism or irrational animus toward a disfavored group. This makes sense. The purpose of judicial deference in the rational-basis context is to ensure that courts do not improperly intrude on the legitimate prerogatives of legislatures. Rational-basis review was never intended to be a smokescreen for those seeking to commandeer the public power of government for purely private ends. *Kelo v. City of New London*, 545 U.S. 469, 477 (2005) ("[T]he City would no doubt be forbidden from taking petitioners' land for the purpose of conferring a private benefit on a particular private party."); *Cleburne*, 473 U.S. at 448.

**C.    *Craigmiles*, *Casket Royale*, and *Peachtree* Properly Applied Rational-Basis Review and Should Guide the Court Here.**

There is no need for this Court to break new ground. Including the district court below, four of the five cases involving rational-basis challenges to restrictions on who may sell a casket ruled in favor of the plaintiffs. *See Craigmiles v. Giles*, 312 F.3d 220 (6th Cir. 2002); *Casket Royale, Inc. v. Mississippi*, 124 F. Supp. 2d 434 (S.D. Miss. 2000); *Peachtree Caskets Direct, Inc. v. Ga. State Bd. of Funeral Servs.*, No. 1:98-cv-3084-MHS, 1999 WL 33651794 (N.D. Ga. Feb. 9, 1999). The sole outlier is *Powers*.

*Craigmiles*, *Casket Royale*, and *Peachtree* applied the rational-basis methodology described above and should guide this Court here. *Craigmiles* rejected at least six asserted justifications for requiring casket retailers to be licensed funeral directors, and did so because none of the purported rationales plausibly bore a logical connection to the law.[18] For example, Tennessee asserted that requiring casket retailers to be licensed funeral directors ensured that everyone who sells caskets is subject to the FTC Funeral Rule's price disclosures. 312 F.3d at 227. But *Craigmiles* rejected that rationale because the purpose of the Funeral Rule was to prevent licensed funeral directors from using lump-sum pricing for

---

[18]    *Craigmiles* considered, and rejected, six purported rationales: (1) preventing the spread of communicable diseases; (2) improving customer service; (3) preventing casket sellers from engaging in fraud or misrepresentation; (4) ensuring that the Funeral Rule applies to all casket sellers; (5) protecting pre-need casket buyers; and (6) ensuring that casket sellers are trained in grief. 312 F.3d at 225-28.

funeral goods and services. *Id.* at 228. Logically, a person who sells only caskets

cannot conceal the price of the casket from consumers, and certainly cannot

conceal the casket price by lumping the casket in with funeral services such as the

embalming of remains. *See id*. Upon determining that the challenged statute

lacked any logical connection to even hypothetical rationales, the *Craigmiles* panel

did exactly what the Supreme Court and courts within the Fifth Circuit have done

in the dozens of plaintiffs-wins rational-basis cases cited in footnotes 13 and 14

above: strike the unconstitutional law down.

Although *Casket Royale* did not reach the ultimate question of economic

protectionism, it too addressed each of seven asserted rationales for requiring

casket retailers to be licensed funeral directors, and rejected every one because

each lacked a logical connection with the challenged statute.[19] For example,

Mississippi argued that restricting who may sell a casket advanced the state's

prohibition on soliciting dead bodies. 124 F. Supp. 2d at 439. The court rejected

Mississippi's argument because the solicitation prohibition did not forbid soliciting

casket sales, and hence the sale of caskets by third-party retailers would have no

impact at all on soliciting bodies. *Id.*

---

[19]   *Casket Royale* considered, and rejected, at least seven asserted rationales for forcing casket
retailers to become state-licensed funeral directors: (1) speeding up burials; (2) ensuring seller
competence; (3) ensuring that the casket sale occurs where the burial will occur; (4) improving
customer service; (5) improving product quality; (6) preventing solicitation of bodies; and (7)
ensuring accountability of casket sellers. *Casket Royale*, 124 F. Supp. 2d at 438-40.

Finally, in *Peachtree*, the court held that Georgia could not rationally assert that caskets are such a danger to public health and consumers that only state-licensed professionals may sell them, when neither statutes nor administrative regulations prescribed any standards for the construction and use of caskets.[20] 1999 WL 33651794, at *1.

In sum, *Craigmiles*, *Casket Royale*, and *Peachtree*, and indeed the entire body of rational-basis case law, reflect two principles vital to deciding this case. First, the government does not prevail simply by uttering a vague generalization about public health, safety, or welfare. Instead, when the government articulates a legitimate interest, there must be a factually plausible, logical connection between the articulated interest and the challenged law. Second, *Craigmiles*, *Casket Royale*, and *Peachtree* did not rule for the plaintiffs because of mere disagreement with the policy preferences of the legislature. Instead, the plaintiffs established through an analysis of the statutory scheme and relevant evidence that there was no rationale connection between any plausible government interest and the restriction on who may sell a casket. It was this *arbitrariness*—not a policy disagreement—that was fatal to the law in those cases.[21]

---

[20] *Peachtree* considered, and rejected, two rationales for forcing casket retailers to become state-licensed funeral directors: (1) public health and (2) consumer protection. *Peachtree Caskets Direct*, 1999 WL 33651794, at *1.

[21] The State Board's *amicus* argues that the Abbey's constitutional claims are foreclosed by two Fourth Circuit decisions, *Guardian Plans, Inc. v. Teague*, 870 F.2d 123 (4th Cir. 1989) and *Brown v. Hovatter*, 561 F.3d 357 (4th Cir. 2009). (LFDA Amicus Br. at 17-18.) Both cases are

**IV.   THE DISTRICT COURT CORRECTLY DETERMINED THAT, AS IN *CRAIGMILES*, *CASKET ROYALE*, AND *PEACHTREE*, CONSUMER PROTECTION DOES NOT JUSTIFY PROHIBITING THE ABBEY AND DEACON MARK FROM SELLING CASKETS.**

The District Court should be affirmed because it properly held that the challenged restrictions on who may sell a casket bear no rational relationship to any government interest in consumer protection.  In terms of context, the district court understood that the FTC's conclusions about the exploitation of casket consumers by funeral directors was the background against which to evaluate the plausibility of the State Board's proffered rationales for the law.  The district court also understood that the structure of funeral pricing always forces consumers to pay a non-declinable fee to funeral directors in the thousands of dollars, and this reality negated any suggestion by the State Board that a consumer would ever be

readily distinguishable, however.  In *Guardian Plans*, an insurance company sought to arrange funerals in advance by selling funeral services and merchandise on a preneed basis, meaning these arrangements would be made before the purchaser needed them.  *Id.* at 124.  In other words, *Guardian Plans* sought to do two things that the Abbey and Deacon Mark do not: arrange funerals by selling funeral services and arrange funerals on a preneed basis.  Because it is plausibly rational for the government to protect consumers by licensing who may enter into complex financial contracts and hold money in trust, *Guardian Plans* reasonably upheld the statute challenged there.  Unlike the district court below, the trial court in *Guardian Plans* apparently found no evidence of an illegitimate governmental interest, no arbitrariness, and concluded that, unlike here, the plaintiffs' challenge was a mere disagreement with the Virginia legislature.  That is why the Fourth Circuit affirmed.  Here, on the other hand, there is no complex financial transaction with money held in trust, just the sale of a wooden box, no relationship with a legitimate government interest, and evidence of illegitimate economic protectionism.

   *Brown* is similarly distinguishable.  In *Brown*, non-funeral directors sought to own and operate full-service funeral homes through corporations even though Maryland had a general rule that funeral homes must be owned and operated by state-licensed funeral directors.  *Brown*, 561 F.3d at 360-361.  As in *Guardian Plans*, the plaintiffs in *Brown* sought to have non-funeral directors oversee the entire work of a funeral director through corporations.  In contrast, all the Abbey and Deacon Mark want to do is sell a wooden box.

without the assistance of a funeral director, except by deliberate choice. Then,

because there is no plausible relationship between consumer protection and who

may sell a wooden box, the district court correctly rejected the State Board's

assertion that the challenged statutes advance consumer protection.

### A. The District Court Was Correct That the Funeral Rule and the Structure of Funeral Pricing Provide the Proper Context for the Constitutional Analysis.

The district court recognized that the plausibility of the State Board's

hypothetical assertions about consumer protection had to be measured against the

reality of funeral-director regulation at the federal level. As detailed in the facts

section above on pages 10-13, and as the district court found, (USCA5 at 908), the

FTC has determined that funeral directors used, and absent federal oversight would

continue to use, their legal monopoly on providing funeral services to exploit

consumers purchasing caskets. Thus, it is all but impossible to credit the State

Board's assertions that a hypothetical Louisiana legislator could rationally choose

to perpetuate the funeral directors' casket monopoly in Louisiana in order to

protect consumers.

The district court also correctly recognized that the factual premise of the

State Board's consumer-protection argument is false and hence that its argument is

flatly illogical. This false factual premise is that casket consumers do not have

access to a funeral director unless a funeral director sells the casket. In fact,

whenever someone retains a funeral home for burial, that funeral home charges the consumer a non-declinable service fee of $3,000-$4,000.  (USCA5 at 909 (citing 16 C.F.R. § 453.2(b)(4)(iii)(C) (describing required disclosure for non-declinable service fee)).)  It is *always the case* that a consumer is paying the funeral director thousands of dollars for advice, which the consumer is free to accept or reject.[22]

Thus, there is absolutely no logical connection between any governmental interest in consumer access to funeral directors and forcing consumers to purchase caskets from only funeral directors.  The district court was correct that economic protectionism is the only plausible reason to force consumers to pay funeral directors for caskets on top of forcing consumers to pay funeral directors the non-declinable service fee whenever someone ones dies.

## B.    The District Court Was Correct That Funeral Directors Are Not "Grief Counselors."

The district court correctly recognized that there is no logical connection between Louisiana's licensing scheme for funeral directors and supposed "grief counseling."  Funeral directors in Louisiana are not "grief counselors."  Louisiana law does not require one to study grief to become a licensed funeral director.  (USCA5 at 744:22 - 745:19.)  Nor is there any requirement that a funeral-director apprentice learn about grief.  (*Id.* at 746:12-15.)

---

[22]    The State Board's argument is tantamount to arguing that when a person hires a plumber, psychologist, or podiatrist, only plumbers, psychologists, and podiatrists should be able to sell that person plumbing supplies, self-help books, or shoes.

Furthermore, as discussed above, funeral-services pricing requires a consumer to pay her funeral director thousands of dollars for the non-declinable service fee if she wants her loved one cared for after death. Consequently, every consumer pays for supposed "grief counseling" and may always avail herself of her funeral director's guidance if she so chooses. *Craigmiles*, 312 F.3d at 228 ("[E]ven those who purchase from casket retailers will still need a licensed funeral director for arranging services and handling the body, at which time the survivors may still receive the benefit of the funeral director's psychological training."). Forcing the casket salesperson to be a state-licensed funeral director is irrationally superfluous, and this requirement exists only to ensure that funeral directors profit from the casket purchase, not to ensure that consumers have "grief counseling."[23]

Finally, as *Craigmiles* recognized, "survivors must deal with a panoply of vendors in order to make funeral arrangements, from churches to food vendors for a wake, none of whom is required to have this psychological training." 312 F.3d at 228. There is nothing that distinguishes caskets from other funeral-related purchases, other than price, which is why the funeral-director cartel is before this Court fighting so hard against monks to preserve its casket-selling monopoly.[24]

---

[23]   Louisiana's law is, in fact, less rational than the one the Sixth Circuit struck down in *Craigmiles* because, unlike the challenged law in Tennessee, Louisiana funeral directors are not required to complete any psychological training, including grief counseling. 312 F.3d at 228.

[24]   Although the State Board had no affirmative evidentiary burden at trial, it is telling that there is not even a hint of evidence from anywhere in America that third-party casket sales cause "grief counseling" problems for consumers, or how "grief counseling" in the context of selling caskets could possibly amount to anything more than being a decent human being.

**C.    The District Court Correctly Rejected the State Board's Alleged Worries About Southern Louisiana Crypts and the Varied State of Human Remains.**

The State Board, both below and now before this Court, places great emphasis on whether the casket retailer will be "competent," particularly because some families in southern Louisiana reuse burial spaces or because there are variations in the state of human remains (such as decomposition and odor) that necessitate specialized casket choices.  (Appellants' Br. at 20-23.)  The Louisiana Funeral Directors Association echoes the concern about southern Louisiana crypts in its *amicus* brief.  (LFDA *Amicus* Br. at 12-13.)

Concerns about crypt size or variations in the state of human remains have no logical connection to the challenged statutes.  There is absolutely no legal requirement that a person be interred in a casket or that a casket be capable of sealing remains away.  Nor are there any requirements about casket size, design, materials, or price.  The State Board does not test knowledge of southern Louisiana crypt dimensions, nor require apprentices to acquire such knowledge.  The district court found that "'[b]ecause nothing prevents licensed funeral directors from selling shoddy caskets at high prices, the licensing requirement bears no rational relationship to increasing the quality of burial containers.'"  (USCA5 at 914 (quoting *Craigmiles*, 312 F.3d at 226).)

The concern about "competence" actually manifests itself in the State Board's brief as an irrational resentment of both the obvious competence of Deacon Mark and Abbott Justin Brown (the head of the Abbey), and the fact that anyone is capable of selling a casket. Abbot Justin and Deacon Mark testified that it makes sense to contact a person's funeral director and the cemetery to ensure that the casket is appropriate for the burial space, (*see* USCA5 at 716:17-20; 729-730), and the State Board treats this commonsense testimony as a damning admission that only a funeral director is qualified to sell a casket. (Appellants' Br. at 21-22.)

But the testimony is innocuous. Because caskets are entirely optional, and because funeral directors are required to use any casket the customer desires, 16 C.F.R. § 453.4(b), a funeral director does nothing more than offer suggestions about casket selection that the consumer is free to reject. *Craigmiles*, 110 F. Supp. 2d at 662 ("Customers can choose any casket they desire, snug or airy, despite the views of the funeral director and regardless of the cause of the deceased's death."). And, as already discussed, consumers must pay their funeral directors thousands of dollars in non-declinable service fees, which includes advice on what sort of casket to buy.

Consumers may take this advice or not, and they may choose to supplement this advice by talking to casket retailers such as Deacon Mark. The legislature left

decisions about casket use and design solely to consumers, and it is the contractual

duty of the funeral director to address issues that arise as a result of these consumer

choices.[25]  Thus, where the consumer is free to make any decision he or she wants

with respect to the casket, and where the consumer is *always* paying the funeral

director thousands of dollars for advice as part of the non-declinable service fee,

there is no factually plausible connection between ensuring that a consumer has

advice about issues such as southern Louisiana crypts or decomposition and

forcing a consumer to buy a casket from a licensed funeral director.  *See*

*Craigmiles*, 312 F.3d at 226 ("The availability of casket retailers will not prevent

funeral directors from continuing to dispense this advice.").[26]

### D.    The District Court Was Correct That Internet Casket Sales Fatally Undermine Any Consumer-Protection Rationale.

The district court was correct that third-party casket sales from other states,

especially over the Internet, render Louisiana's casket-selling restrictions irrational.

There are 300 million people in America who are not funeral directors but who can

---

[25]   At most, the funeral directors are worried about inconvenience.  If a client purchases a casket before obtaining the funeral director's advice, and it turns out to be too large, then the funeral director would have to help the client find a suitable alternative as part of his contractual obligations under the non-declinable service fee.  (USCA5 at 813:17-24.)  If a casket that was too large were ever actually used in a funeral, that would be the fault of the funeral director. Louisiana has no legitimate interest in abridging the monks' constitutional rights simply to reduce the "risk" of inconveniencing funeral directors.

[26]  The district court correctly ruled that the State Board's vague generalizations amounted to nothing more than worries about customer service, and mere customer service is not a legitimate government interest that justifies abridging the monks' right to earn an honest living.  (USCA5 at 914-915 (citing *Casket Royale*, 124 F. Supp. 2d at 439).)

legally sell caskets to Louisiana consumers:  the residents of every state except

Louisiana.  Indeed, the trial testimony established that there is a thriving retail

casket market across the country, especially for caskets ordered over the Internet.

As the district court found, "Wal-Mart" and other big-box retailers sell caskets

over the Internet.  (USCA5 at 908).  And, under Louisiana law and the FTC

Funeral Rule, it is perfectly legal for a Louisiana consumer to buy a casket from

any of these 300 million Americans who do not live in Louisiana, and Louisiana

funeral directors are required to allow consumers to use these caskets.[27]  (*See*

USCA5 at 909.)  Given that *consumers* have a *right* under Louisiana and federal

law to buy a casket anywhere and use those caskets at any funeral home, and given

that Louisiana *consumers* can and do routinely buy caskets from out-of-state

retailers, what possible *consumer-protection* interest could Louisiana have in

making it a crime for Louisianans without a funeral-director's license to sell

caskets?[28]

---

[27]   For the reasons explained in the district court's opinion, Louisiana could not make it a crime for someone outside of Louisiana to sell a casket to a Louisiana resident when it is perfectly legal for the Louisianan to make that purchase.  (*See* USCA5 at 913.)

[28]   The case law recognizes that changed circumstances can render a once-rational law irrational.  This is indeed what happened in the seminal rational-basis decision in *Carolene Products*.  *Compare United States v. Carolene Prods. Co.*, 304 U.S. 144, 153 (1938) *with Milnot Co. v. Richardson*, 350 F. Supp. 221, 224-25 (S.D. Ill. 1972).  *See also Leary v. United States*, 395 U.S. 6, 38 n.68 (1969) (a statute is subject to constitutional attack if legislative facts upon which statute was based no longer exist);  *Nashville, C. & St. L. Ry. v. Walters*, 294 U.S. 405, 415 (1935) ("[a] statute valid when enacted may become invalid by change in the conditions to which it is applied"); *Chastleton Corp. v. Sinclair*, 264 U.S. 543, 547 (1924) ("[a] Court is not at liberty to shut its eyes to an obvious mistake, when the validity of the law depends upon the truth of what is declared").

Not only does Louisiana demonstrably lack any consumer-protection interest in forcing consumers to buy caskets from funeral directors, the State Board does not even believe its own consumer-protection argument.  The trial testimony established that the State Board makes no attempt to track the use of third-party caskets in Louisiana.  (USCA5 at 750:2-4, Test. of Dawn Scardino, Executive Director, State Board.)  Nor does the State Board have any literature or online information warning consumers about the alleged "dangers" of third-party caskets. (*Id.* at 750:5-16.)  There is no rational sense in which an asserted consumer-protection interest can be imputed to the legislature when absolutely no one, not even the State Board, actually believes that third-party caskets pose any danger to consumers.   Indeed, the absence of any effort on the part of the State Board or its amicus lobbying group to warn consumers about third-party caskets stands in marked contrast to their considerable efforts in this litigation to prevent anyone but funeral directors from selling caskets.  The only plausible explanation for this difference in effort levels is economic protectionism, not consumer protection.

### E.     The State Board Has Correctly Abandoned Any Argument That Louisiana Has a Legitimate Health or Safety Interest in Who Sells Caskets.

The State Board never made any serious argument below that restricting who may sell a casket affects public health and safety.  Nor has it pressed any such argument before this Court.  Nevertheless, the Abbey and Deacon Mark will

briefly explain why there is no logical connection between who may sell a casket and public health and safety.

A casket is just a box. It has four sides, a top, and a bottom. Louisiana law does not require a casket for burial. (USCA5 at 504, ¶¶ 7 d-e.) Nor does the law specify any design standards for caskets. USCA5 at 914; *see also Craigmiles*, 312 F.3d at 225; *Casket Royale*, 124 F. Supp. 2d at 439; *Peachtree*, 1999 WL 33651794, at *1. One does not need to attend mortuary school, or study funeral-related issues, to become a funeral director. (USCA5 at 744:22 - 745:1, 745:6-15; La. Rev. Stat. § 37:842.) Plaintiffs' expert Dr. Harrington testified that in his fifteen years of research on the funeral industry—which includes extensive study of the academic and Federal Trade Commission literature on all aspects of the funeral industry—he has never encountered any evidence or argument suggesting that caskets play a role in public health. (USCA5 at 772:20-24.) The State Board's own expert Billy Henry, who is a Louisiana-licensed funeral director, also testified that caskets serve no public health or safety purpose. (USCA5 at 810:9-811:2.) None of the four other constitutional challenges to casket laws, including the lone case where the challenge actually failed, found that caskets have anything to do with public health and safety. *See generally Powers*, 379 F.3d 1208; *Craigmiles*, 312 F.3d 220; *Casket Royale*, 124 F. Supp. 2d 434; *Peachtree Caskets*, 1999 WL 33651794. Thus, to the extent that this Court might posit public health

as a possible rationale for Louisiana's restrictions on casket sales, that justification would not survive rational-basis review.

**V.    THE DISTRICT COURT CORRECTLY RULED IN FAVOR OF THE ABBEY AND DEACON MARK UNDER *CRAIGMILES*, *CASKET ROYALE*, AND *PEACHTREE*, AND AFFIRMING THE DISTRICT COURT IS NOT A RETURN TO *LOCHNER*.**

The Abbey and Deacon Mark have, through reasoning and evidence, negated the following purported rationales for restricting who may sell a casket to the public:  (1) pure economic protectionism is a legitimate government interest; (2) licensing casket retailers enables casket consumers to obtain grief counseling; (3) licensure is related to southern Louisiana crypts; (4) variations in the state of human remains require retail sale by a licensed funeral director; and (5) public health and safety require the licensure of casket retailers.  Add to that the additional rationales that were considered and rejected by federal courts across the country considering identical constitutional claims.  *See supra* n. 18-20.  The Abbot and Deacon Mark have carried their burden of negating every plausible rationale for restricting who may sell a casket.

Having negated every possible legitimate basis for the challenged statutes, this Court is left with the obvious:  The purpose and effect of restricting who may sell a casket is pure economic protectionism.  Because there is no hypothetically legitimate reason for restricting who may sell a casket, and because the record is indisputable that the actual reason for restricting who may sell a casket is

illegitimate, the Abbot and Deacon Mark respectfully ask the Court to follow

*Craigmiles* and the other casket precedents, and affirm the district court.[29]

"Although economic rights are at stake," in ruling for the Abbey and Deacon

Mark, this Court would not be "basing [its] decision on [its] personal approach to

economics, but on the Equal Protection Clause's requirement that similarly situated

persons must be treated equally," in this case, those who sell caskets and those who

sell other harmless consumer products. *Merrifield*, 547 F.3d at 992. "The

*Craigmiles* court said it best:

> Our decision today is not a return to *Lochner*, by which
> this court would elevate its economic theory over that of
> legislative bodies. No sophisticated economic analysis is
> required to see the pretextual nature of the state's
> proffered explanations for [the challenged law]. We are
> not imposing our view of a well-functioning market on
> the people of [this state]. Instead, we invalidate only the
> [decisionmaking body]'s naked attempt to raise a fortress
> protecting [one subsection of an industry at the expense
> of another similarly situated]…"

*Id.* (quoting *Craigmiles*, 312 F.3d at 229) (internal citation omitted).

Judicial deference does not require judicial abdication, and invalidating an

---

[29]   The Abbey and Deacon Mark note that they do not abandon, and preserve for Supreme Court review, the argument they raised below that restricting who may sell a casket violates the Privileges or Immunities Clause of the Fourteenth Amendment. They recognize, however, that the district court was correct in dismissing that claim on the ground that it is foreclosed by the Supreme Court's decision in the *Slaughter-House Cases*, 83 U.S. 36 (1873). Because only the Supreme Court can overturn the *Slaughter-House Cases*, it would have been a waste of judicial and party resources for the Abbey and Deacon Mark to have sought a superfluous determination of that claim before this Court.

arbitrary and irrational law is the constitutional duty of the judiciary, not a return to *Lochner*.

## CONCLUSION

This Court has already recognized that that the casket retailers in *Craigmiles*, prevailed because "there was no logical reason to require casket sellers to obtain funeral director licenses…" *Houston Taxi*, 660 F.3d at 240. The monks' challenge here is materially indistinguishable from *Craigmiles* and the result should be the same.

The district court properly held that economic protectionism devoid of any public purpose is not a legitimate government interest under rational-basis review. The district court then properly concluded that the Abbey and Deacon Mark, through reasoning and evidence, systematically negated every plausible alternative explanation for Louisiana's restrictions on who may sell a casket. Upon determining that the challenged statutes lacked a legitimate hypothetical explanation, and that the actual purpose and effect of the law is illegitimate protectionism, the district court entered judgment for the monks. The district court's judgment should be affirmed.

Dated this 12th day of December, 2011.

Respectfully submitted,

/s/ Scott G. Bullock
Scott G. Bullock
William H. Mellor
Jeff Rowes
Darpana Sheth
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900
Arlington, Virginia 22203
(703) 682-9320

Frederick E. Schmidt, Sr.
KOCH & SCHMIDT, L.L.C.
650 Poydras Street, Suite 2415
New Orleans, Louisiana 70130
(504) 208-9040

*Counsel for Plaintiffs-Appellees*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 12th day of December, 2011, I caused these

Brief of Appellees to be filed electronically with the Clerk of the Court using the

CM/ECF System, which will send notice of such filing to the following registered

CM/ECF users:

Walter R. Woodruff, Jr.
BOPP LAW CORPORATION
1350 Park Drive
Mandeville, Louisiana  70471
(985) 727-6022

David W. Gruning
ATTORNEY AT LAW
526 Pine Street, Suite 418
New Orleans, Louisiana  70118
(505) 861-5653

*Counsel for Appellants*

*Counsel for Appellants*

George B. Recile
CHEHARDY, SHERMAN, ELLIS, MURRAY,
  RECILE, GRIFFITH, STAKELUM & HAYES, L.L.P.
1 Galleria Boulevard, Suite 1100
Metairie, Louisiana  70001
(504) 833-5600

*Counsel for Appellants*

/s/ Scott G. Bullock
*Counsel for Appellees*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

[ X ] this brief contains [*12,208*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[    ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2007*] in [*14pt Times New Roman*]; *or*

[    ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated:  <u>December 12, 2011</u>        <u>/s/ Scott G. Bullock        </u>
                                                    *Counsel for Appellees*