IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
March 20, 2013

Lyle W. Cayce
Clerk

No. 11-30756

ST. JOSEPH ABBEY; MARK COUDRAIN

Plaintiffs-Appellees

v.

PAUL WES CASTILLE; ROYAL J. DAVID; GERALD L. SCHOEN, III; J. STEVEN COX; ANDREW HAYES; MARGARET SHEHEE; KELLY RUSH WILLIAMS; LOUIS CHARBONNET, in their official capacities as Members of the Louisiana State Board of Embalmers and Funeral Directors; PATRICK H. SANDERS, in his official capacity in place of Oscar A. Rollins (deceased)

Defendants-Appellants

Appeal from the United States District Court
for the Eastern District of Louisiana

Before HIGGINBOTHAM, HAYNES, and HIGGINSON, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

An Abbey of the Benedictine Order of the Catholic Church challenges as unconstitutional rules issued by the Louisiana Board of Funeral Directors granting funeral homes an exclusive right to sell caskets. The district court enjoined their enforcement, finding that they deny equal protection and due process of law. We will AFFIRM the judgment of the district court.

No. 11-30756

## I.

The thirty-eight monks of St. Joseph Abbey earn their way in a pastoral setting. In years past, the Abbey's timberland provided a source of income. After Hurricane Katrina destroyed its timber, the Abbey began looking for other revenue sources. For generations the Abbey has made simple wooden caskets to bury its monks. Public interest in the Abbey's caskets increased after two bishops were buried in Abbey caskets in the 1990s. Seeing potential in this demand, the Abbey invested $200,000 in "St. Joseph Woodworks," managed by Mark Coudrain, a deacon of the Church and an employee of the Abbey. The business plan was simple. St. Joseph Woodworks offered one product – caskets in two models, "monastic" and "traditional," priced at $1,500 and $2,000 respectively, significantly lower than those offered by funeral homes. The Abbey offers no funeral services. It does not prepare a deceased for burial and its monks do not participate in funerals, except as pastors.

To be sure, Louisiana does not regulate the use of a casket, container, or other enclosure for the burial remains; has no requirements for the construction or design of caskets; and does not require that caskets be sealed. Individuals may construct their own caskets for funerals in Louisiana or purchase caskets from out-of-state suppliers via the internet. Indeed, no Louisiana law even requires a person to be buried in a casket.

Nonetheless, the Abbey's plan for casket sales faced significant regulatory burdens. The Louisiana State Board of Embalmers and Funeral Directors ("State Board") argues that, under state law, intrastate sales of caskets to the public may be made only by a state-licensed funeral director and only at a state-licensed funeral home.[1] This stricture has two layers. First, a prospective

---

[1] *See* LA. REV. STAT. §§ 37:831(37)-(39), :848.

casket retailer must become a licensed funeral establishment.[2] This requires building a layout parlor for thirty people, a display room for six caskets, an arrangement room, and embalming facilities.[3] Second, the establishment must employ a full-time funeral director.[4] A funeral director must have a high school diploma or GED, pass thirty credit hours at an accredited college, and complete a one-time apprenticeship.[5] The apprenticeship must consist of full-time employment and be the apprentice's "principal occupation." None of this mandatory training relates to caskets or grief counseling. A funeral director must also pass a test administered by the International Conference of Funeral Examining Boards.[6] The exam does not test Louisiana law or burial practices. In Louisiana, funeral directors are the only individuals authorized by law to provide funeral services. In sum, the State Board's sole regulation of caskets presently is to restrict their intrastate sales to funeral homes. There are no other strictures over their quality or use. The district court found the State's scheme to be the last of its kind in the nation. The State Board had never succeeded in any enforcement actions against a third party seller prior to its effort to halt the Abbey's consumer sales.

## II.

Louisiana's restriction on the sales of caskets exists against the background of substantial federal regulation of the funeral industry. Beginning in the early 1980s, the FTC promulgated regulations, known as the Funeral

---

[2] *See id.* §§ 37:831(37), (39), :842(D).

[3] *See id.* § 37:842(D)(3).

[4] *Id.* § 37:842(D)(1).

[5] *Id.* § 37:842(A).

[6] *Id.* §§ 37:842(A)(6), :831(38).

Rule, to mitigate unfair or deceptive practices of funeral providers.[7] These practices included failing to disclose price information and "bundling" of products and services. Bundling forced consumers to buy a range of funeral goods and services – whether or not they needed or wanted the whole bundle. The FTC determined that it could not rely on state funeral licensing boards to curb such practices because the state boards were "dominated by funeral directors."[8] The funeral directors had organized themselves into industry groups, which lobbied state legislatures and made practices such as a refusal to disclose prices part of their professional "ethics" code. The Funeral Rule required funeral directors to provide consumers with itemized price lists and allow consumers to purchase only those goods and services they actually wanted. A principal objective of the Funeral Rule was to "encourage entry into the funeral market of new competitors seeking to attract business by offering lower prices."[9]

After the Funeral Rule forced funeral homes to disclose casket prices, the significant mark-ups charged by the funeral homes became apparent, and a market for third-party casket sales emerged. Funeral directors responded to this growing competition by refusing to use third-party caskets unless consumers paid large "casket-handling" fees. The FTC responded by amending the Funeral Rule to ban casket-handling fees.[10] In its comments on that rulemaking, the FTC explained that "casket handling fees are unfair conditions on a consumer's right to decline unwanted items he or she may wish to purchase elsewhere."[11]

---

[7] Trade Regulation Rule; Funeral Industry Practices, 47 Fed. Reg. 42260 (Sept. 24, 1982); *see* 16 C.F.R. § 453.1 *et seq.*

[8] *Id.* at 44289.

[9] *Id.* at 42293.

[10] Funeral Industry Practices Trade Regulation Rule, 59 Fed. Reg. 1592, 1593 (Jan. 11, 1994).

[11] *Id.* at 1604.

In 2008, the FTC not only decided to retain the Funeral Rule but also expressly declined to subject third-party casket vendors to the rule because, in contrast to state-licensed funeral directors, "[t]he record [was] bereft of evidence indicating significant consumer injury caused by third-party sellers."[12] Because of the FTC's interventions, Louisiana funeral homes cannot discourage consumer choice by applying casket-handling fees or by forcing consumers to purchase bundled goods and services, and Louisiana consumers can now buy caskets from third-party retailers – unless those retailers reside in Louisiana.

As the district court found, a funeral director may charge a non-declinable service fee ranging from $3,000 to $4,000 in addition to charges for individually priced goods and services.[13] This non-declinable service fee includes advice about casket selection, and the funeral director is contractually bound to assist the consumer if a problem arises. Thus, whenever a consumer retains a funeral director in Louisiana,[14] the consumer pays the funeral director thousands of dollars to provide advice on every aspect of funeral planning, including casket purchase – whether the consumer is buying a casket from the funeral home or using a homemade casket or one purchased from an out-of-state third-party retailer.

## III.

In December 2007, the State Board ordered the Abbey not to sell caskets to the public, and the next month, Boyd Mothe, Sr., the chair of the Legislative Committee for the Louisiana Funeral Directors Association and a state-licensed

---

[12] 73 Fed. Reg. 13740, 13745 (Mar. 14, 2008).

[13] *See* Regulatory Review of the Trade Regulation Rule on Funeral Industry Practices, 16 C.F.R. § 453.2(b)(4)(iii)(C).

[14] Indeed, it appears that all persons seeking to dispose of a deceased are obligated to engage a Louisiana funeral establishment. *See* La. Rev. Stat. § 37:848(D)(5).

funeral director who owns several funeral homes, initiated a formal complaint against the Abbey. By law, the nine-member State Board must consist of four licensed funeral directors, four licensed embalmers, and just one representative not affiliated with the funeral industry.[15] In 2008 and 2010, the Abbey petitioned the legislature to change the law to allow non-profit charitable groups such as the Abbey to sell caskets. Although two bills to amend the law were drafted, it appears neither made it out of committee. No member of the public opposed the bills.

Facing these hurdles, the Abbey and Deacon Mark Coudrain filed this suit in the district court under 42 U.S.C. § 1983. The Abbey and Coudrain sought declaratory and injunctive relief against enforcement of the Louisiana Embalming and Funeral Directors Act by the nine members of the State Board. These defendants are charged with the Act's enforcement under state law and are sued in their official capacity. The complaint asserted that the licensure requirements confine intrastate sales of caskets to sales by funeral directors at funeral homes, denying the Abbey and Coudrain equal protection and due process under the Fourteenth Amendment because they bear no rational relationship to any valid governmental interest. The State Board responded that the challenged rules, insulating funeral directors from competition, are rationally related to the State's legitimate interest in regulating the funeral profession. In the alternative, citing the Tenth Circuit's decision in *Powers v. Harris*,[16] the State Board maintained that economic protection of a particular industry is a legitimate state interest. After conducting a bench trial, the district court issued judgment for the Abbey, reaffirming its earlier finding that this brand of economic protectionism is not a legitimate state interest and

---

[15] *Id.* § 37:832(A)(2), (B)(1), (B)(d)(2).

[16] 379 F.3d 1208 (10th Cir. 2004).

finding no rational relationship between the challenged law and Louisiana's interests in consumer protection, public health, and public safety. The State timely appealed.

After examining the record, we had serious doubts about the constitutionality of the State Board's regulation of intrastate casket sales, but we saw a potential state law ground for deciding the case. Specifically, we questioned whether, under Louisiana law, the State Board has authority to regulate casket sales in and of themselves when such sales are not incidental to the seller's provision of any other funeral services.[17] Because under well-settled precedent this Court must avoid deciding a constitutional issue "if there is some other ground upon which the case may be disposed of"[18] and because resolution of the State Board's authority must come at the hand of the Louisiana Supreme Court,[19] we deferred a final decision in the case to allow the Louisiana Supreme Court to rule on the statutory uncertainty. In the interest of federalism and constitutional avoidance, we certified the following question to the Louisiana Supreme Court: Whether Louisiana law furnishes the Louisiana State Board of Embalmers and Funeral Directors with authority to regulate casket sales when made by a retailer who does not provide any other funeral services.[20] The Louisiana Supreme Court denied certification without explanation.[21] Ours cannot be the final word on uncertainty in state law. The parties do not

---

[17] *St. Joseph Abbey v. Castille*, 700 F.3d 154, 165-68 (5th Cir. 2012).

[18] *Ashwander v. Tennessee Valley Authority*, 297 U.S. 298, 347 (1936) (Brandeis, J., concurring), reh'g denied 297 U.S. 728 (1936). *See also County Court of Ulster County v. Allen*, 422 U.S. 140, 154 (1979); *Burton v. United States*, 196 U.S. 283, 295 (1905).

[19] *See Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 508 (1985) (O'Connor, J., concurring).

[20] *St. Joseph Abbey*, 700 F.3d at 169.

[21] *St. Joseph Abbey v. Castille*, No. 2012-CQ-2326 (La. Jan. 11, 2013).

challenge the Board's authority here, and the state has declined our request to clarify this statute's meaning. We turn to the issues the parties have brought and proceed to rule on the constitutionality of the challenged law.

## IV.

We review the district court's findings of fact for clear error and its conclusions of law de novo.[22]

### A.

The State Board maintains that the regulation of intrastate casket sales enjoys the deference due classic economic regulation. Alternatively, the State Board contends that it is a rational draw upon the State's police powers in protection of consumers and public health. The Abbey responds that no rational basis can or has been articulated that it has not negated.

Chief Justice Stone's footnote 4 in *Carolene Products*, etched in the brains of several generations of law students, both described and prescribed a fundamental dichotomy of judicial review; it retreated from the aggressive review of state regulation of business in the *Lochner* period while proceeding in the opposite direction in matters of personal liberty.[23] Justice Douglas's opinion in *Williamson v. Lee Optical*[24] is generally seen as a zenith of this judicial deference to state economic regulation and the State Board invokes its protections, including its willingness to accept post hoc hypotheses for economic regulation. But even *Williamson* offers the State Board little succor. In

---

[22] *See One Beacon Ins. Co. v. Crowley Marine Servs., Inc.*, 648 F.3d 258, 262 (5th Cir. 2011).

[23] 304 U.S. 144, 152 n.4 (1938).

[24] 348 U.S. 483 (1955).

*Williamson*, the Oklahoma legislature forbade opticians to fit or replace eyeglass lenses in frames without a lens prescription from an ophthalmologist or optometrist, even when the replaced lens could easily be duplicated by an optician.[25] Despite the coloration of wealth transfer to ophthalmologists and optometrists, the Court accepted the suggestion that the legislature might have concluded that some persons would benefit from seeing a doctor when replacing a lens and refused to strike down the legislation, in turn rejecting the opticians' due process and equal protection claims. It placed emphasis on the "evil at hand for correction" to which the law was aimed, concluding that the measure was a rational, if not "in every respect logically consistent," means of addressing the perceived ill.[26] The Supreme Court took the same approach in *City of New Orleans v. Dukes*.[27] It upheld a New Orleans ordinance that permitted only pushcart food vendors with eight or more years of experience in the French Quarter to continue to operate in the neighborhood. It reasoned that reducing the number of pushcart vendors, and limiting their ranks to those most likely to have the deepest ties to the area, advanced the City's legitimate objective of maintaining the French Quarter's historic character and tourist appeal.[28]

As a threshold argument, the State Board urges that pure economic protection of a discrete industry is an exercise of a valid state interest. It points to the Tenth Circuit's decision in *Powers v. Harris*, a case in which two members of the panel said as much in turning back an attack on an Oklahoma scheme

---

[25] *Id.* at 485. The law was also challenged for exempting sellers of ready-to-wear glasses from the prescription requirement, barring advertising of lenses and frames, and prohibiting retailers from sharing commercial space with certain eye care professionals. *Id.* at 488-89.

[26] *Id.* at 487-88.

[27] 427 U.S. 297 (1976).

[28] *Id.*

similar to Louisiana's.[29] Judge Tymkovich, the third member of the panel, refused to join the majority opinion's broad approbation of "economic protectionism" as a valid governmental interest.[30] Rather, he concurred in the judgment, persuaded that the State had otherwise identified a sufficient public purpose.[31] The Abbey in turn points to *Craigmiles v. Giles*, in which the Sixth Circuit rejected "economic protectionism" as a rational basis for similar casket regulations, striking down those regulations as a denial of due process and equal protection.[32]

These two courts gave differing answers to the question of whether the legislation before them, both statutory schemes quite similar to that now before us, drew upon a legitimate state interest. *Craigmiles* found that "protecting a discrete interest group from economic competition is not a legitimate governmental purpose."[33] The *Powers* court saw the statutory scheme before it as simple economic protectionism, "the favored pastime of state and local government," and in its mind a permissible basis for regulation.[34] In turn, it rejected the challenge to the regulations that limited the sale of caskets to funeral directors.[35]

The *Powers* court claimed that only three courts have held that "protecting a discrete interest group from economic competition is not a legitimate

---

[29] 379 F.3d 1208 (10th Cir. 2004).

[30] *Id.* at 1225-27 (Tymkovich, J., concurring).

[31] *Id.*

[32] 312 F.3d 220 (6th Cir. 2002).

[33] *Id.* at 224.

[34] *Powers*, 379 F.3d at 1221.

[35] *Id.* at 1225.

governmental purpose,'"[36] and criticized those courts' holdings as having no direct support in Supreme Court precedents. It then stated: "In contrast, the Supreme Court has consistently held that protecting or favoring one particular intrastate industry, absent a specific federal constitutional or statutory violation, is a legitimate state interest."[37] However, none of the Supreme Court cases *Powers* cites stands for that proposition. Rather, the cases indicate that protecting or favoring a particular intrastate industry is not an *illegitimate* interest when protection of the industry can be linked to advancement of the public interest or general welfare. *Craigmiles* and *Powers* rest on their different implicit answers to the question of whether the state legislation was supportable by rational basis. *Craigmiles* looked for rationality and found none. *Powers* found economic protection to be a traditional wielding of state power and rational by definition.

As we see it, neither precedent nor broader principles suggest that mere economic protection of a particular industry is a legitimate governmental purpose,[38] but economic protection, that is favortism, may well be supported by a post hoc perceived rationale as in *Williamson* – without which it is aptly described as a naked transfer of wealth.[39] Recently, we upheld against similar challenge a Houston taxi cab permitting scheme that disfavored small cab

---

[36] *Id.* at 1218 (quoting *Craigmiles,* 312 F.3d at 224).

[37] *Id.* at 1220.

[38] *See, e.g., Merrifield v. Lockyer*, 547 F.3d 978, 991 n.15 (9th Cir. 2008) ("We conclude that mere economic protectionism for the sake of economic protectionism is irrational with respect to determining if a classification survives rational basis review. . . . [E]conomic protectionism for its own sake, regardless of its relation to the common good, cannot be said to be in furtherance of a legitimate governmental interest.").

[39] *See* Cass R. Sunstein, *Naked Preferences and the Constitution*, 84 COLUM. L. REV. 1689 (1984).

companies.[40] Notably, we approved of the *Craigmiles* court's reasoning, as it "confirm[ed] that naked economic preferences are impermissible to the extent that they harm consumers."[41] However, we found that even if Houston had been "motivated in part by economic protectionism, there is no real dispute that promoting full-service taxi operations is a legitimate government purpose under the rational basis test."[42] We thus sustained the City's measure. It follows that the State Board cannot escape the pivotal inquiry of whether there is such a rational basis, one that can now be articulated and is not plainly refuted by the Abbey on the record compiled by the district court at trial. We turn then to the State Board's alternative argument – that the challenged restrictions are rationally related to protection of public health, safety, and consumer welfare, beginning with some settled guiding principles.

## B.

As the Abbey points out, although rational basis review places no affirmative evidentiary burden on the government, plaintiffs may nonetheless negate a seemingly plausible basis for the law by adducing evidence of irrationality.[43] And of course, as we earlier observed, *Williamson* insists upon a rational basis, which it found. Mindful that a hypothetical rationale, even post hoc, cannot be fantasy, and that the State Board's chosen means must rationally relate to the state interests it articulates, we turn to the State Board's proffered rational bases for the challenged law. Our analysis does not proceed with abstraction for hypothesized ends and means do not include post hoc

---

[40] *Greater Houston Small Taxicab Co. Owners Ass'n v. City of Houston*, 660 F.3d 235, (5th Cir. 2011).

[41] *Id.* at 240.

[42] *Id.*

[43] *See F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314-15 (1993).

hypothesized facts. Thus, we will examine the State Board's rationale informed by the setting and history of the challenged rule.

1. *Consumer Protection*

The State Board argues that the challenged law is rationally related to consumer protection because it restricts predatory sales practices by third-party sellers and protects consumers from purchasing a casket that is not suitable for the given burial space. Of course, this is a perfectly rational statement of hypothesized footings for the challenged law. But it is betrayed by the undisputed facts.

For one, the State Board's argument obscures the actual structure of the challenged law. No provision mandates licensure requirements for casket retailers or insists that a casket retailer employ someone trained in the business of funeral direction. Rather, the licensure requirements and other restrictions imposed on prospective casket retailers create funeral industry control over intrastate casket sales. The scheme is built on the statute's interlocking definitions of "funeral establishment" and "funeral directing":

> **"Funeral establishment"** means any place or premises duly licensed by the board and devoted to or used in the care and preparation for burial of the body of a deceased person or maintained or held out to the public by advertising or otherwise as ***the office or place for the practice of funeral directing***.[44]
>
> **"Funeral directing"** means the operation of a funeral home, or, by way of illustration and not limitation, any service whatsoever connected with the management of funerals, or the supervision of hearses or funeral cars, the purchase of caskets or other funeral merchandise, and ***retail sale and display thereof,*** the cleaning or dressing of dead human bodies for burial, and the performance or supervision of any service or act connected with the management of funerals from time of death until the body or bodies are delivered to

---

[44] LA. REV. STAT. § 37:831(39) (emphasis added).

the cemetery, crematory, or other agent for the purpose of disposition.[45]

In other words, because a funeral establishment includes any "office or place for the practice of funeral directing," and "funeral directing" includes "the purchase of caskets or other funeral merchandise and the retail and display thereof," a casket retailer must comply with all the statutory requirements for funeral directors and funeral establishments. No rule addresses casket retailers or imposes requirements for the sale of caskets beyond confining intrastate sales to funeral homes. But, it is urged, this exclusivity will assure purchasers of caskets informed counsel.

The district court found that the extensive training the law requires of budding funeral directors does not include instruction on caskets, or how to counsel grieving customers. Given that Louisiana does not require a person to be buried in a casket, restrict casket purchases in any way by Louisianans over the internet or from other sources out of state, nor imposes requirements on any intrastate seller of caskets directly to consumers, including funeral directors, regarding casket size, design, material, or price, whatever special expertise a funeral director may have in casket selection is irrelevant to it being the sole seller of caskets.[46] This is because customers pay funeral directors a non-

---

[45] *Id*. § 37:831(37) (emphasis added).

[46] Indeed, we highlight that the statute does not clearly extend State Board Authority to casket sales unconnected to funeral services. The monks, as carpenters and vendors of their wares, do little that equates to operating a funeral home. Whereas the State Board regulates the business of funeral directing, and specifically here, Section 848 ("Unlawful practice"), states "[n]o person, not certified and registered under the provisions of this Chapter, shall . . . conduct the business of funeral directing," LA. REV. STAT. § 37:848(A), that prohibition only raises the question of whether the monks are conducting the business of funeral directing. We observe that Term 37 of Section 831 explains that "'[f]uneral directing' means the operation of a funeral home . . . ." *Id*. § 37:831(37). This, the monks are not doing. As "illustration and not limitation," Term 37 clarifies that operating a funeral home encompasses: "any service whatsoever connected with the management of funerals," *id*.—not what the monks want to do; "any service whatsoever connected with . . . the supervision of hearses or funeral cars,"

declinable service fee, which contractually binds a funeral director to assist the customer with funeral and burial logistics, including, for example, casket selection, even if the customer does not purchase the casket from the funeral director. As a consequence, the customer should receive the benefit of the funeral director's experience in matters of casket selection, including complexities that arise from burial conditions in any given area. Indeed the FTC has found that "[b]y allowing a basic services fee, the Rule ensures that consumers get the benefit of choosing goods and services among a variety of options – including the option to purchase goods from the funeral provider's competitors . . . ."[47] A customer of a funeral home receives the same service whether or not he purchases the casket from the funeral home, and because only funeral homes can sell funeral services, and all disposing of dead bodies must be "through a funeral establishment," he must engage their service.[48]

Moreover, like the district court and consistent with its findings, we find that the challenged law is not rationally related to policing deceptive sales tactics. In declining to expand the Funeral Rule's scope to cover third-party sellers of caskets and urns, the FTC found "there is insufficient evidence that . . . third-party sellers of funeral goods are engaged in widespread unfair or

---

*id.*—still not; "any service whatsoever connected with . . . the purchase of caskets or other funeral merchandise," *id.*—still not, but telling, because the broad interpretation of State Board authority, suggested by the State Board, would give it not just oversight of selling but also of all buying, which cannot be correct; and "any service whatsoever connected with . . . the retail sale and display thereof . . . ." *Id.* This is it, but not exactly. The monks do not clearly offer a funeral home "*service . . . connected with . . .* retail sale and display . . . ." *Id.* (emphasis added). The remainder of Term 37 then lists services that unquestionably, like "hearses," are part of the "operation of a funeral home," such as "cleaning and dressing of dead human bodies . . . ." *See id.*

[47] 73 Fed. Reg. at 13747.

[48] *See* LA. REV. STAT. § 37:848(D)(5).

15

deceptive acts or practices."[49]  In fact, the Commission found the record "bereft of evidence indicating significant consumer injury caused by third-party sellers"[50] and recognized that third-party sellers do not have the same incentive as funeral home sellers to engage in deceptive sales tactics.[51]

But, even if independent third-party sellers pose a risk of engaging in deceptive sales practices, and assuming arguendo that the state legislature could so conclude, there is a disconnect between restricting casket sales to funeral homes and preventing consumer fraud and abuse.  Putting aside the fact that funeral homes, not independent sellers, have been the problem for consumers with their bundling of product and markups of caskets,[52] Louisiana's Unfair Trade Practices and Consumer Protection Law already polices inappropriate sales tactics by all sellers of caskets.  Louisiana's Unfair Trade Practices and Consumer Protection Law declares that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are . . . unlawful" and empowers the state attorney general to make "rules and regulations" to interpret the provisions of the Chapter.[53]  Under the section of Louisiana's administrative code implementing the law, the state attorney general is authorized to regulate unfair trade practices in casket sales, whether or not those sales are made by state-licensed funeral homes, but must do so consistent with rules promulgated by the FTC and court decisions interpreting

---

[49] 73 Fed. Reg. at 13742.

[50] *Id.* at 13745.

[51] *Id.* ("Indeed, third-party retailers have a strong economic incentive to display their prices to the public at large because offering a lower price is the primary way they compete against funeral providers for sales of funeral goods, such as caskets.").

[52] *See supra* notes 7-12, 48-50 and accompanying text.

[53] LA. REV. STAT. § 51:1405.

those rules.[54] In short, Louisiana's consumer protection regime reaches the sales practices of all intrastate sellers of caskets and can strike at any unfair practices but interestingly only in a way complementary and consistent with the Federal Trade Commission Act.

To be clear, the FTC's Funeral Rule has not preempted Louisiana from making its own independent assessment of consumer abuse by third-party intrastate sellers. But, were the attorney general to promulgate a rule that, as the State Board's enforcement action here aims to do, shut out third-party sellers, implementing Louisiana's ability to create a consumer protection scheme would be in tension with the rules of the FTC – rules that compel funeral homes both to accept caskets purchased from others and to not charge fees for doing so. Nor would such a rule square with FTC findings or rulemaking resting on the conclusion that third-party sellers do not engage in consumer abuse. This matrix of Louisiana law, while not dispositive of our inquiry, sheds much light on the disconnect between the post hoc hypothesis of consumer protection and the grant of an exclusive right of sale to funeral homes. That grant of an exclusive right of sale adds nothing to protect consumers and puts them at a greater risk of abuse including exploitative prices.

---

[54] *See* LA. ADMIN. CODE 16, § 501 (2012). Section 501 provides:
These rules and regulations shall be consistent with Section 5(a)(1) of the Federal Trade Commission Act [15 U.S.C. 45(a)(1)], as from time to time amended, any rule or regulation promulgated thereunder, and any finally adjudicated court decision interpreting the provisions of said act, rules, and regulations. This consistency shall be, therefore, the same as the Federal Trade Commission's responsibility over both:

1. anti-trust or other restraint of trade types of activities; and

2. unfair or deceptive types of activities relating to trade and commerce as it affects consumer and business interests.

Section 5(a)(1) of the Federal Trade Commission Act is the provision under which the FTC enacted the Funeral Rule, and under which it declined to extend the Funeral Rule to third-party sellers of caskets and urns. *See* 73 Fed. Reg. at 13742 & nn. 1-2, 13745.

2. *Public Health and Safety*

Relatedly, we find that no rational relationship exists between public health and safety and restricting intrastate casket sales to funeral directors. Rather, this purported rationale for the challenged law elides the realties of Louisiana's regulation of caskets and burials. That Louisiana does not even require a casket for burial, does not impose requirements for their construction or design, does not require a casket to be sealed before burial, and does not require funeral directors to have any special expertise in caskets leads us to conclude that no rational relationship exists between public health and safety and limiting intrastate sales of caskets to funeral establishments.[55]

The great deference due state economic regulation does not demand judicial blindness to the history of a challenged rule or the context of its adoption nor does it require courts to accept nonsensical explanations for regulation. The deference we owe expresses mighty principles of federalism and judicial roles. The principle we protect from the hand of the State today protects an equally vital core principle – the taking of wealth and handing it to others when it comes not as economic protectionism in service of the public good but as "economic" protection of the rulemakers' pockets. Nor is the ghost of *Lochner* lurking about. We deploy no economic theory of social statics or draw upon a judicial vision of free enterprise. Nor do we doom state regulation of casket sales. We insist only that Louisiana's regulation not be irrational – the outer-most limits of due process and equal protection – as Justice Harlan put it, the inquiry is whether "[the] measure bears a rational relation to a constitutionally permissible

---

[55] *Cf. Merrifield*, 547 F.3d at 989 ("[T]he singling out of a particular economic group, with no rational or logical reason for doing so, was strong evidence of an economic animus with no relation to public health, morals or safety.").

objective."[56]  Answering that question is well within Article III's confines of judicial review.

## V.

The funeral directors have offered no rational basis for their challenged rule and, try as we are required to do, we can suppose none.  We AFFIRM the judgment of the district court.

---

[56] *Ferguson v. Skrupa*, 372 U.S. 726, 733 (1963) (Harlan, J., concurring).